SPENCE *v.* STURGIS STEEL GO-CART CO.

1. CORPORATIONS—SERVICES—CONTRACTS—IMPLIED CONTRACT — EVIDENCE—SUFFICIENCY.

   In an action for services rendered defendant corporation as its general manager, evidence *held*, sufficient to support the finding of the trial court that plaintiff was acting under an express contract, and that an implied agreement arose to pay what the services were reasonably worth.

2. SAME—TEST OF IMPLIED CONTRACT TO PAY.

   The bare fact of a valuable service rendered for a corporation, standing alone, does not raise an implied promise to pay, but the test is as to whether such services were performed under circumstances fairly raising a presumption that the parties understood and intended that they should be paid for.

3. ESTOPPEL—CORPORATIONS— ANNUAL REPORT — DIRECTORS — LIABILITY SHOWN.

   Defendant's contention that, because plaintiff's claim for compensation as general manager of defendant corporation was not included as a liability in defendant's annual report to the State, which plaintiff signed as a director, he is therefore estopped from asserting said claim, on

the ground that innocent stockholders were thereby induced to purchase stock and hence defrauded, cannot be sustained, where no stockholders are parties to the action, and there is no evidence of any purchase of stock in reliance upon said report.

Error to St. Joseph; Knowlen (Frederick W.), J. Submitted October 6, 1921. (Docket No. 34.) Decided December 22, 1921. Rehearing denied February 8, 1922.

Assumpsit by Charles L. Spence against the Sturgis Steel Go-Cart Company for services rendered. Judgment for plaintiff. Defendant brings error. Affirmed.

*J. Paul Wait* (*John B. Corliss*, of counsel), for appellant.

*Theo T. Jacobs*, for appellee.

STEERE, C. J. Defendant, as its name implies, is a manufacturing corporation of the city of Sturgis, engaged in constructing various kinds of go-carts. On June 29, 1917, its factory, machinery and equipment were destroyed by fire, compelling either construction of an entirely new plant for resumption of business, or liquidation. After some discord and delay the directors finally decided to rebuild and resume operations. Plaintiff was then one of defendant's directors and mayor of Sturgis. His main business activities and interests were with the National Carbon Coated Paper Company, of which he was the general manager, receiving a large salary. Some time after defendant's fire, its president, Mr. Burdick, told plaintiff if he would take hold of the business of the go-cart company as its general manager and conduct its affairs, he thought harmony could be restored and business resumed, otherwise the industry would be

lost to their city; and asked him if he would do so. Plaintiff consented to temporarily become general manager of defendant, retaining his management of the National Carbon Coated Paper Company.

A meeting of defendant's stockholders was held September 3, 1917, at which all members of its board of directors and all but one of its stockholders were present and plaintiff was elected general manager, as its records show, and it was decided to continue the business. Plaintiff was authorized at a meeting of the directors to take up the matter of rebuilding, submit plans and prices at the next meeting, which he did, and was empowered to proceed. He at once assumed the duties of the position to which he had been elected and started reconstruction; the company having arranged to finance its rehabilitation by sale of preferred stock and otherwise. No action was taken at the stockholders' meeting or by the board of directors fixing his compensation. He held the position of its general manager during reconstruction of the plant and reorganization of its business, retiring about August 14, 1918. During that time a brick and steel factory building was erected having 65,000 feet of floor space with machinery and other equipment installed at a cost of over $100,000; the concern was again put in production with the different styles of go-carts it built reduced from 175 to 71, the business reorganized with prices adjusted to costs and an assistant manager put in charge at the end of six months, or about March 1, 1918, at a salary of $5,000 per year.

Claiming he had been urged by the president and stockholders of defendant to take charge of its business, elected by its stockholders and employed by its directors and president as its temporary general manager, with assurance of compensation for his services, plaintiff made claim to defendant for pay at

the rate of $200 per month during the first 6 months of his incumbency, or until the business was again in successful operation and an assistant manager took charge. Defendant not recognizing his claim, he brought this action in the circuit court of St. Joseph county.

The case was tried before the court without a jury. Findings of fact with conclusions of law thereon were filed and judgment was rendered for plaintiff in the sum of $1,200, on April 12, 1920. Proposed amendments to the court's findings were filed by defendant on April 21st, and at the same time a motion was filed for a new trial; plaintiff's counsel stipulating to extension of time therefor. The two motions were heard together on September 28th, and on October 7th an order was made denying both motions. On October 21st exceptions were separately filed to refusal of both motions, which were the first exceptions filed in the case.

Beyond the facts already stated, which are practically undisputed, the court found as follows:

"The evidence shows and the court so finds that the board of directors took no part in the rebuilding or management, except to attend directors' meetings. The entire plant was rebuilt, machinery and equipment selected by Mr. Spence and installed and in the month of January, 1918, the factory was completed, fully equipped with proper machinery and the manufacture of its products, to-wit: go-carts, commenced. A catalogue showing the latest styles and prices was also gotten out by Mr. Spence. He also did the other necessary work in getting the product on the market.

"The court further finds there is no dispute from the evidence but what these services were known to the stockholders and all the directors of the company. Several witnesses testified as to the value of his services. None of the witnesses placed the value of these services at a less value than the amount claimed by plaintiff but most of the witnesses a great deal higher. Defendant does not deny but what these services were

performed.   The court further finds that these services were of such a nature and character that they were clearly outside of his duties as a director.   The court further finds that the amount charged is a very reasonable sum considering the character of the services rendered.

"The defendant did not dispute but what these services had been performed or the value of said services but claimed that the plaintiff is estopped in claiming any compensation for the services for the reason stated in the notice to their plea of the general issue.   The court further finds that in August, 1918, Mr. Burdick, who was then president of the company, held an option for the sale or purchase of the stock of plaintiff, and some of the other stockholders of said company, that the said F. L. Burdick sold said stock that he held an option of purchase to some other gentlemen from the city of Detroit and that after August 14, 1918, plaintiff was no longer a stockholder of said company.   The court finds that Mr. Burdick and one or two others of the original stockholders still remained in said company and Mr. Burdick was still an officer of said company for some time after the sale of the stock of plaintiff and some of the other stockholders to the Detroit gentlemen.   Although there was a change in the owners of some of the stock, the corporate identity of the corporation was not in any manner changed by this sale of stock.   The further finding is also made that plaintiff never had any interviews or made any representations to these new stockholders.   That although they had an auditor examine the books before they purchased the stock and the records of the company showed that Mr. Spence was general manager and had not received any salary, yet the auditor or representative of these new stockholders did not see fit to interview Mr. Spence.

"It was claimed by the defendant that inasmuch as the salary for the months of September, October, November and December, 1917, was not included as an indebtedness of the company in the annual statement filed in the secretary of State's office of the State of Michigan that plaintiff was estopped after having signed said statement from recovering for these four

months. The court finds there was no evidence introduced that these new stockholders relied upon this statement at the time of the purchase or were in any way deceived thereby."

A careful examination of the testimony results in the conclusion that there is ample evidence in the record to support the court's material findings of fact.

It is seriously contended for defendant that "plaintiff was not employed by any action of the board of directors or officer having authority to create obligations," and the court inconsistently found "plaintiff was acting under an express contract and that an implied agreement arose to pay what the services were reasonably worth." The trend of plaintiff's evidence is an express contract for services with an implied contract to pay what they proved to be reasonably worth. The record unquestionably shows an express contract for his services in an important position, that valuable services in such capacity were openly rendered to the knowledge of defendant's officers and the benefits accepted by it. Plaintiff was elected defendant's general manager on September 3, 1917. He testified, and we find it nowhere disputed, that when it was decided to continue the business and he was requested to investigate the building of a new plant and submit at the next meeting of the board of directors plans and prices, which he did, he "was then authorized to proceed with the building of a new factory and to equip it with such machinery and other equipment as was necessary to put it on a highly efficient basis," which he proceeded to do. Defendant's then president, Mr. Burdick, and one of its witnesses, testified he supposed "Mr. Spence was to look after the building and the general business of the concern," that later when he saw some of the men not working industriously as they should he gave them no orders but just "as president of the company and director I re-

ferred it to Mr. Spence who was the general manager."
He was then asked and answered as follows:

"*Q.* Why did you report to him?
"*A.* Because he was the general manager.
"*Q.* Did he have all the authority there?
"*A.* All that I know of.
"*Q.* Couldn't you have said anything to him?
"*A.* No.
"*Q.* And still you expected him to undertake all that responsibility for nothing?
"*A.* No.
"*Q.* What?
"*A.* No, expected to pay him for it, if he put in the time he said he did, or I supposed he did."

While the bare fact of a valuable service rendered for a corporation does not, standing alone, raise an implied promise to pay, the test of an implied contract for compensation is whether such services were performed under circumstances fairly raising a presumption that the parties understood and intended that they should be paid for, or at least that reasonable men in like situation as those who received and are benefited by the service naturally would and ought to understand and expect compensation was to be paid. *Notley* v. *First State Bank,* 154 Mich. 676.

The case of *TenEyck* v. *Railroad Co.,* 74 Mich. 226 (3 L. R. A. 378), is analogous to the instant case in various respects. Plaintiff was a stockholder and director in the defendant corporation, and also its attorney. Early in its history a resolution was adopted by its board of directors appointing him "to attend to the obtaining of right of away (way?) along the whole line, and to collect in the notes given along the line in aid of the railroad," no reference being made to his compensation. He rendered valuable services in attending to that business, which defendant refused' to pay him for, raising similar questions to those urged here. The court there said:

"These were services which were not embraced in the ordinary duties of a director of the company. They were valuable to the corporation, and were such as to which they had a right to agree upon the compensation to be paid; and if his services were engaged for the above purpose, and they were performed, there arose an implied agreement that they should pay what such services were reasonably worth, and this the plaintiff proved upon the trial."

It is further urged that plaintiff is precluded from recovery under the doctrine of equitable estoppel for the reason that he defrauded innocent purchasers of his and others' stock by signing the annual report to the State of the financial condition of defendant without including this claim, and not informing them of its existence when they purchased said stock in August from the defendant's president, Burdick, who held an option for it.

No innocent purchasers of stock in defendant corporation are made parties to this action either by plaintiff or their own intervention. The sale to other parties of a quantity of stock in the corporation by plaintiff or others might change its control and management but did not change its corporate identity. This action is solely between plaintiff and the corporation, for which for a time he rendered services as its general manager. Plaintiff testified that he had no dealings with nor wrote any letters to any of the prospective purchasers with whom Burdick dealt, made no representations to them and did not know who they were beyond the information they were parties from Detroit. The court found plaintiff never had interviews with nor made any representations to those new stockholders. In the *TenEyck Case*, where offered testimony as to an innocent investment company being deceived and defrauded by plaintiff was excluded, this court said:

"If plaintiff's position as a director, and what he has done and represented to the investment company, estop him from asserting any claim against the corporation, such estoppel cannot be set up as a defense in an action at law against the corporation, by it or the investment company."

As before noted, this is not an action by one of the claimed deceived new stockholders against defendant for losses resulting from buying its stock relying on a false report by it to the secretary of State of its financial condition, nor against plaintiff himself for misrepresentations which induced a losing investment. Neither is there any testimony in this record that any of the new stockholders, or their auditor who examined defendant's books, ever had any communication with plaintiff or saw defendant's reports before they purchased, or that any purchase was induced by reliance thereon.

We find it unnecessary to discuss the authorities cited for defendant from other jurisdictions. Upon this record, and under our own decisions, the conclusion is reached that the evidence supports the findings and judgment of the trial court.

The judgment is therefore affirmed.

MOORE, WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.