*In re* CAMFIELD ESTATE.

MEYERING *v.* MILLIMAN.

MILLIMAN *v.* MEYERING.

1. CONTRACTS—IMPLIED CONTRACTS—EXPECTATION OF PAYMENT OF COMPENSATION.

The test of an implied contract for compensation is whether services were performed under circumstances fairly raising a presumption that the parties understood and intended that they should be paid for, or at least that reasonable men in like situation as those who received and benefited by the service naturally would and ought to understand and expect compensation was to be paid.

2. SAME—COMPENSATION—PRESUMPTIONS.

The presumption that compensation was intended is rebutted by

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Contracts § 239.
[2] 12 Am Jur, Contracts § 323 *et seq.*
[3] 5 Am Jur, Attorneys at Law §§ 154, 181.
[4] 3 Am Jur, Appeal and Error § 815.

circumstances which negate an intention to pay for services rendered, where no compensation is discussed or agreed upon in advance for services requested by and rendered to another and especially where one of the circumstances is the presence of a strong self-interest in the outcome of the transaction on the part of the party furnishing the service.

3. ATTORNEY AND CLIENT—PAYMENT FOR SERVICES—FINDING OF TRIAL COURT—PREPONDERANCE OF EVIDENCE.

Finding of trial court in 3 consolidated cases that attorney had performed legal services for the widow of his business associate under circumstances that were such that reasonable people would conclude that the services were performed without charge, *held,* not against the preponderance of the evidence presented in record.

4. APPEAL AND ERROR—ISSUES OF FACT—LAW CASES.

The Supreme Court does not try issues of fact *de novo* on appeal in nonjury law cases.

Appeal from Ottawa; Smith (Raymond L.), J. Submitted October 18, 1957. (Docket Nos. 64–66, Calendar Nos. 47,531–47,533.) Decided March 5, 1958.

Claim by Lawrence V. Meyering against the estate of R. W. Camfield, deceased, and Marie J. (Camfield) Milliman, executrix, for legal fees in connection with the probate of the estate. Claim denied in probate court and taken to circuit court.

Action by Lawrence V. Meyering against Marie J. Milliman for payment of fees for legal services rendered her personally in connection with the estate of her former deceased husband.

Action by Marie J. Milliman against Lawrence V. Meyering on promissory note, with set-off claiming legal fees.

Matters consolidated for trial and appeal. Judgments for defendant on claim and demand for legal

fees. Judgment for plaintiff Milliman for sums due on note. Plaintiff claimant and judgment-debtor Meyering appeals. Affirmed.

*McCobb, Heaney & Dunn,* for appellant.

*Warner, Norcross & Judd* (*Harold S. Sawyer* and *Joseph B. White,* of counsel), for appellee.

EDWARDS, J. We deal here with consolidated appeals in 3 cases involving claims for legal services on the part of a lawyer, who was likewise an officer and stockholder in a corporate enterprise. In each proceeding, the opposite party is the widow of the deceased president of the company in question to whose position the appellant claiming these legal fees ultimately succeeded. The claims were disallowed in the circuit court below.

The 3 cases heard by the circuit judge were:

(1) An appeal by Lawrence V. Meyering, appellant here, from a denial by the Ottawa county probate court of a claim filed by him in the sum of $10,000 for legal services he claimed to have rendered to Marie J. Milliman, executrix of the estate of Russell W. Camfield, deceased. After trial *de novo,* the circuit judge affirmed the probate court decision.

(2) A suit by Lawrence V. Meyering against Marie J. Milliman for legal services claimed to have been rendered to her individually—the major portion of these legal services being the negotiation of the sale of Mrs. Milliman's interests in the Camfield Manufacturing Company. As to this suit, the trial judge found no cause for action.

(3) The third suit is a suit in assumpsit by Mrs. Milliman on a promissory note given to her by Mr. Meyering for $5,000, plus interest due. In relation to this suit, defendant Meyering's answer admitted the obligation on the note and pleaded the indebted-

ness referred to in the lawsuit described above as set-off. The circuit judge denied the set-off and granted judgment for the amount of the note, plus interest.

From each of these judgments appellant appeals, claiming in the words of appellant's own summary:

"Meyering was requested to perform professional services.

"The services are the kind that normally call for payment of attorney fees.

"The parties are not related.

"The services were performed exceptionally well.

"The Russell W. Camfield estate and Mrs. Milliman, individually and as executrix, accepted all the benefits of Meyering's services.

"The testimony as to the reasonableness of the amount of appellant's claims is not disputed."

It appears that as to most, if not all, of the contentions above, appellee offered no contrary testimony. It is, however, appellee's position that the services were rendered by Mr. Meyering without any contemplation between the parties of fees being charged therefor, partly as an accommodation to the bereaved widow of a business associate and benefactor, and partly because of indirect compensation which he received as an officer of the Camfield Manufacturing Company and ultimately 1 of its major stockholders.

As might be anticipated, the record is somewhat lengthy and involves a considerable number of transactions. We have reviewed it with care and do not believe we can improve upon the careful statement of facts entered by the trial judge in his opinion, which we, therefore, adopt:

"Lawrence V. Meyering practiced law in Chicago, Illinois, from 1931 to 1942. He was personally acquainted with Russell W. Camfield, a manufacturer in Grand Haven, Michigan. As a result of prior

discussions Meyering and Camfield entered into an agreement in 1942 wherein Meyering was to work for Camfield for an agreed annual salary as the company legal advisor, the company to furnish a law library and necessary office facilities.

"Camfield was then operating as a partnership with his wife as the other partner. Later Camfield took in Meyering and others as partners, Meyering paying for his interest out of his earnings. The partnership was later dissolved and incorporated, Meyering retaining his interest as a stockholder. Meyering became the corporation's secretary-treasurer.

"The Meyerings and Camfields lived next door to each other and became close social friends. Meyering, over the years, and while associated with Russell W. Camfield in business, performed many legal services for Mr. Camfield and his wife, Marie, without charge. There is evidence from which it could be found that Meyering performed legal services without charge for other partners and later for officers and directors of the Camfield Company.

"In 1947 Russell W. Camfield met sudden death due to an accident. This left Marie J. Camfield, the surviving wife, in control of the company. Meyering aspired to the presidency of the firm. He so informed his friend and next-door neighbor, Marie J. Camfield. Mrs. Camfield agreed with Meyering and used her influence with the board of directors to accomplish this result. Meyering became the company president and served in that capacity until he and Mrs. Camfield sold their respective interests.

"Meyering took Russell W. Camfield's will to the home of his widow and explained the procedure necessary to its probate. Mrs. Camfield told Meyering to go ahead and do whatever was necessary. Meyering proceeded to probate the will, prepared the required papers, and advised the wife who served in the capacity of executrix. There was mention of Meyering's undertaking for Mrs. Camfield during the company board meetings and of the fact that this

could be done on company time and with company
facilities in order to keep down the expense for Mrs.
Camfield. One of the board members recalled that
Meyering told him in 1949 or 1950 that he never ex-
pected payment or thanks for his work on behalf of
Mrs. Camfield.

"In 1949 with the permission of Mrs. Camfield
the services of attorney Louis Osterhous were se-
cured to perform work for the estate. Meyering in
that same year formally withdrew as attorney for the
estate although it is clear that he continued to advise
the executrix and widow in estate matters. The firm
of Seidman & Seidman performed tax service work
for the estate and in that same connection the law
firm of Amberg, Law & Buchen was retained.

"Of significant importance was the filing by the
estate of estimates of attorney and accountant ex-
penses without mention of any charge therefor by
Mr. Meyering.

"Mrs. Camfield remarried. Thereafter Mr. Meyer-
ing moved into the Camfield home and occupied it
for several years* without payment of rent. Mrs.
Camfield, now Mrs. Milliman desired to sell her stock
in the company. It is clear that she agreed that
Meyering should do what was necessary to effect a
sale. To this end Meyering devoted some time and
effort. It is equally clear that Meyering was as
zealous in protecting his own interests in the com-
pany. Much of his effort in this respect was made
during company business trips.

"Finally he was able to consummate a sale to him-
self and 2 others, Ely and Kimelman. Mrs. Milliman
finds no fault with the terms of this sale. During
the negotiations for this sale Meyering suggested to
Mrs. Milliman that, due to his personal interest
in it and participation in it as a party, that it would
be better to secure the services of an outside attor-
ney, with the expense to be borne by the buyers.
This was done, but due to the unsatisfactory work

---

* We note that the exact period was 8 months, not "several years."

of the attorney, Meyering dispensed with his services and drew up the necessary papers himself.

"About June 1, 1951, the sale of her stock to Meyering, Ely and Kimelman was effected. On June 1, 1951, Meyering borrowed from Mrs. Milliman the sum of $5,000 in order to pay for part of his share. This loan was evidenced by a note which is the subject of the action in No. 8253. Interest was paid on this note for the first year but when Meyering defaulted in the second instalment of interest and notice was given him of this fact he then and for the first time claimed that Mrs. Milliman owed him for attorney fees for his work as attorney on her behalf as executrix and for personal services as set forth in the pleadings."

Appellant contends that largely as a result of his efforts, both legal and financial, on behalf of Mrs. Milliman, she realized approximately $800,000 from her husband's estate. There is much in this record to indicate that appellant indeed did perform services of great value for Mrs. Milliman. The question which was before the trial court was whether appellant proved facts from which a contract for compensation for these services could be implied, or whether, as contended by appellee, they were rendered to the estate and to Mrs. Milliman gratis, with appellant's consideration therefor being friendship and self-interest factors referred to above. In this regard, appellant's own testimony is interesting:

"I did not at any time discuss the matter of fees with Mrs. Milliman. Mrs. Milliman wasn't the same, you might say as an ordinary client. I had known Russ Camfield closely. He was one of my best friends or my best friend for a period of almost 20 years. * * * I had known Mrs. Milliman for at least 10 years prior to Mr. Camfield's death. At the time of Russ's death the estate looked like a mess and it didn't look like there was going to be much in it. It looked very much as though even some

of the insurance might have to be sacrificed to protect the assets from tax claims, and it was quite a while before the character of the estate changed. My effort was to do everything I could for Mrs. Milliman and I did so. My feeling was, when the whole thing was completed and the outcome was clear and definite that I expected Mrs. Milliman would come into my office and ask me what I owed her or what she owed me.   *   *   *

"I didn't raise the subject of money coming to me from Mrs. Milliman until July of 1953. I called her on the phone and told her I had her letter and I wanted for some time to discuss the subject of my compensation with her, awaiting her return from Virginia, and I suggested she come down to the office where we could discuss it. Mrs. Milliman had not asked me for rent for the house I was living in and has not since. When I met with Mr. Milliman, I told him that I felt that I had done considerable amount of work for the estate and Mrs. Milliman there, that the matters were now substantially finished up and in a very satisfactory manner, and that I thought it was time my compensation was discussed, fixed and paid."

It appears that the date of July, 1953, referred to in the paragraph above, referred to appellant's receipt of a letter from Mrs. Milliman requesting the second payment of interest due on the promissory note.

The trial judge in his finding of fact saw some significance in the fact that appellant's first claim for remuneration followed receipt of this letter:

"The court finds that Lawrence V. Meyering had no expectation or intention of charging the Camfield estate or Mrs. Milliman for any of the services set forth in these actions. Mr. Meyering profited personally by his ascension to the presidency of the company and by the protection of his future stake in the company. These ends were accomplished by his continued performance of legal services to those

who had the means of supporting him. Mr. Meyering did absolutely nothing after the death of Mr. Camfield that would put Mrs. Camfield Milliman upon notice that his services were on any different basis than before. In truth his failure to bill for his services, his failure to include any amount for his service in the affidavits filed, his willingness to sign a formal note for $5,000 when he believed the payee was indebted to him and the payment of a year's interest thereon, his failure to keep complete records of work done and expenditures made, and his statement made to a third party that he expected no pay and no thanks affirmatively indicate a lack of intention to charge for his services."

We note in exhibits S, T and U testimony of 3 members of the board of directors of the Camfield Manufacturing Company, Messrs. Higgins, Genter and Taylor, indicating that the company had agreed that its president, our appellant, should perform legal services for the Camfield estate on company time, for and in consideration of his salary with the company.

On this point, Mr. Genter testified:

"Mr. Meyering was working on the legal end of it for the estate and for Mrs. Camfield, without charge, during the period I was chairman of the board. No question of that.

"*Q.* How do you know that he agreed to do it without charge?

"*A.* I know that to be an absolute fact."

Mr. Taylor testified to the same effect:

"*Q.* Haven't you testified that part of his salary was for performing services for the Camfield estate?

"*A.* I testified that part of his duties as an employee of the Camfield Manufacturing Company were to assist Mrs. Camfield in any manner that he could to settle the Camfield estate.

"*Q*. And so to the extent that he took time to do that his salary compensated for it, in your opinion, isn't that true?

"*A*. The salary that he received from the Camfield Manufacturing Company?

"*Q*. Yes.

"*A*. Yes."

In addition to testifying generally to the same effect, Mr. Higgins also testified:

"Well, I remember one time in his office when we were discussing the situation, I would say it was about 1949 or 1950, that he stated that the thing that he didn't like about handling all this work for Mrs. Milliman was that he would never get any money for it and never get any thanks for it, not be appreciated by her."

As to appellant's claim for legal compensation for negotiation of the sale of Mrs. Milliman's interest in the Camfield Manufacturing Company, appellant himself had an obvious strong self-interest in the stock-purchase agreements ultimately drawn up. He himself purchased a substantial part of the stock, and also procured an employment contract for himself.

Although the issue is not raised before us (presumably because of Mrs. Milliman's satisfaction with the results), we note a genuine question as to whether appellant, under these circumstances, could have served as Mrs. Milliman's attorney in this transaction within the bounds of professional ethics. Canons of Professional Ethics, Canon 6; 29 MS BJ No 5, p 9.

Pertaining to the sale of Mrs. Milliman's interest to Messrs. Ely and Kimelman and himself, appellant testified:

"I negotiated with them a contract that if I were able to buy stock, I would get an employment contract for myself at a total salary of $30,000. My salary at that time was $20,000. The bonus setup

would have been substantially the same as it was. The employment arrangement was discussed at that time but not agreed upon. It was agreed upon before the sale was closed. Under a voting trust agreement my stock was to be subject to the agreement with 3 trustees, Ely, Kimelman and myself, and the majority was to control. The employment contract was approved by the board and adopted by the corporation in January, 1952."

The trial judge, in his summary of the principal problem in this case, said as follows:

"Both parties agree in the briefs submitted that the main question involved in these actions is whether under all the circumstances reasonable people would conclude that the services performed were without charge."

Although appellant, on appeal, divides and rephrases this question in 10 different ways, we are of the opinion that the trial judge's phrasing is adequate to state the issue.

In a case relied upon by appellant, the test of an implied contract has been stated thus by Justice Steere:

"While the bare fact of a valuable service rendered for a corporation does not, standing alone, raise an implied promise to pay, the test of an implied contract for compensation is whether such services were performed under circumstances fairly raising a presumption that the parties understood and intended that they should be paid for, or at least that reasonable men in like situation as those who received and are benefited by the service naturally would and ought to understand and expect compensation was to be paid. *Notley* v. *First State Bank of Vicksburg,* 154 Mich 676." *Spence* v. *Sturgis Steel Go-Cart Co.,* 217 Mich 147, 153.

See, also, *Cascaden* v. *Magryta,* 247 Mich 267 ; *City of Detroit* v. *City of Highland Park,* 326 Mich 78; 54 ALR 548.

In the *Spence Case,* this Court upheld a trial court judgment where on disputed facts compensation was awarded a general manager employed without a compensation agreement after he directed the rebuilding and reactivation of a manufacturing concern destroyed by fire.

In the *Spence Case* (as in *Fletcher* v. *Board of Education of School District Fractional No. 5,* 323 Mich 343), no strong self-interest motives were involved on plaintiff's part and the trial court found that the conduct of the parties reasonably implied compensation.

In our instant situation, the trial court ruled that the evidence did not establish an implied contract for compensation largely because of the obvious self-interest that appellant had in these same transactions.

Where no compensation is discussed or agreed upon in advance for services requested by and rendered to another, the presumption that compensation was intended is rebutted by circumstances which negate such an intention. One of such circumstances is a strong self-interest in the outcome of the transaction on the part of the party furnishing the service. *Peters* v. *Gallagher,* 37 Mich 407 ; *Notley* v. *First State Bank of Vicksburg,* 154 Mich 676; *Gross* v. *Cadwell,* 4 Wash 670 (30 P 1052) ; 54 ALR 548, 561; 58 Am Jur, Work and Labor, §§ 3, 4, 7.

The trial judge heard these cases as the trier of the facts, as well as the law. Where there were conflicts in evidence, he had an opportunity to hear the testimony and to see the witnesses. We cannot find from the record which has been presented to us on appeal that he ignored any vital portion of the testimony, or that the evidence preponderated

against his decision. On appeals at law, we do not try issues of fact *de novo. Jones* v. *Eastern Michigan Motorbuses,* 287 Mich 619; *Hayes Construction Co.* v. *Silverthorn,* 343 Mich 421; *Barnes* v. *Beck,* 348 Mich 286.

The judgments are affirmed. Costs to appellee.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, and VOELKER, JJ., concurred.

KAVANAGH, J., took no part in the decision of this case.