DETROIT CITY COUNCIL v MAYOR OF DETROIT

Docket Nos. 291394 and 291399. Submitted April 14, 2009, at Detroit. Decided April 17, 2009, at 9:00 a.m.

The Detroit City Council brought an action in the Wayne Circuit Court against the mayor of Detroit after the mayor vetoed a city council resolution disapproving the transfer of the Cobo Convention Center to the Detroit Regional Convention Facility Authority under the Regional Convention Facility Authority Act, MCL 141.1351 *et seq.* The court, Isidore Torres, J., granted the Detroit Building Authority's motion to intervene as a defendant. The court issued a declaratory judgment, ruling that the act did not permit the mayor to veto the city council's resolution. The mayor and the building authority appealed separately, and the Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

The trial court correctly concluded that the act does not provide for a mayoral veto of the city council's resolution disapproving the transfer. Under MCL 141.1369(1), only the legislative body (in this case the city council) may disapprove the transfer. The act delineates several powers of the local chief executive officer (in this case the mayor), and those do not include the power to veto the legislative body's disapproval. Recognizing a mayoral veto power in this context would nullify the only provision of the act that confers power on the city council. Only the legislative body has the power to disapprove the transfer. Under the plain language of the act, if a majority of the city council affirmatively votes to disapprove a transfer, the transfer does not occur. While the Detroit City Charter grants the mayor the power to veto city council resolutions, ordinances are subject to the laws of the state. If a city charter conflicts with a statute, the statute prevails. MCL 141.1379(2) specifically preempts any charter provision that is contrary to the act. The charter provision concerning mayoral veto conflicts with the act with respect to the city council's authority to disapprove the transfer.

Affirmed.

MUNICIPAL CORPORATIONS — CITY COUNCILS — MAYORS — VETO POWER OF
    MAYORS — REGIONAL CONVENTION FACILITY AUTHORITY ACT — TOURISM.

   The Regional Convention Facility Authority Act gives the legislative
   body of a local government the exclusive authority to disapprove
   the transfer of a qualified convention center to a regional conven-
   tion facility authority; the legislative body's disapproval will
   prevent the transfer, and the local chief executive officer lacks the
   authority to veto the legislative body's disapproval (MCL
   141.1369[1]).

*David D. Whitaker, Marcel Hurt,* and *Adam Shakoor
& Associates, PC* (by *Adam A. Shakoor*), for the
Detroit City Council.

*Krystal A. Crittendon,* Corporation Counsel, and
*Jeffrey S. Jones* and *Joanne D. Stafford,* Assistant
Corporation Counsels, for the Mayor of Detroit.

*Barris, Sott, Denn & Driker, PLLC* (by *Eugene
Driker, Morley Witus,* and *Rebecca Simkins*), for the
Detroit Building Authority.

Before: TALBOT, P.J., and MURRAY and STEPHENS, JJ.

TALBOT, P.J. In these consolidated and expedited
appeals, defendant Kenneth V. Cockrel, Jr., in his
capacity as mayor of the city of Detroit, and interven-
ing defendant Detroit Building Authority appeal by
right the declaratory judgment in plaintiff's favor
entered by the circuit court. Plaintiff Detroit City
Council sought a declaration that the Regional Con-
vention Facility Authority Act, MCL 141.1351 *et seq.,*
did not authorize a mayoral veto of its resolution
disapproving the transfer of the Cobo Convention
Center to the Detroit Regional Convention Facility
Authority. The circuit court ruled that the mayoral
veto was null and void under the plain language of the
act. We affirm.

I. BASIC FACTS AND PROCEDURAL HISTORY

Cobo Convention Center (Cobo), near the center of downtown Detroit, was built more than half a century ago. In 1985, the Legislature enacted Public Act 106, the State Convention Facility Development Act, MCL 207.621 *et seq.*, which levied a tri-county hotel tax and liquor tax to generate revenue. The development act provided a funding source for a multitude of purposes, including the improvement of convention facilities owned by local governments.[1] The tax was used for security on bonds to pay for a $180 million Cobo renovation, which was completed in 1989. Under 1985 PA 106, the outstanding bonds are to be fully retired in 2015; the hotel and liquor tax distributions will also terminate at that time. MCL 207.629; MCL 207.630.

In light of that sunset date and the current condition and size of Cobo, state and tri-county officials began negotiations for legislation to improve the state's convention centers. In December 2008, the Michigan Legislature enacted Senate Bill 1630. Governor Jennifer Granholm approved the bill in January 2009. The Regional Convention Facility Authority Act, 2008 PA 554, became effective on January 20, 2009. The act provides for the creation of regional convention facility authorities[2] to oversee regional convention centers, including Cobo.[3] To qualify for

---

[1] See *Detroit Edison Co v Detroit*, 180 Mich App 145, 151; 446 NW2d 615 (1989), overruled on other grounds by *City of Taylor v Detroit Edison Co*, 475 Mich 109 (2006).

[2] Such authorities "shall possess the powers, duties, and jurisdictions vested in the authority under this act and other laws." MCL 141.1357(1).

[3] The act defines a "convention facility" as

all or any part of, or any combination of, a convention hall, auditorium, arena, meeting rooms, exhibition area, and related adjacent public areas that are generally available to the public for lease on a short-term basis for holding conventions, meetings, exhibits, and similar events, together with real or personal property, and easements above, on, or under the surface of real or personal property,

improvement under the act, convention facilities are required to be publicly owned, have at least 600,000 square feet, and be located within a qualified city, which is defined as a city with a population exceeding 700,000. MCL 141.1355(i) and (k). As written, the act currently applies only to Cobo,[4] although it may be applied in the future to any qualifying convention facility in a qualifying metropolitan area in Michigan.

In enacting 2008 PA 554, the Legislature recognized that promoting tourism and convention business in Michigan is in the best interests of both the state and local governments. The Legislature found that improving existing regional convention facilities would aid in that endeavor. The Legislature noted that a regional convention facility authority would serve a public purpose. MCL 141.1353. Such an authority could be established in any area that meets the definition of a "qualified metropolitan area."[5] The act created the Detroit Regional Convention Facility Authority (the Authority) as of January 20, 2009, the effective date of the act.[6]

used or intended to be used for holding conventions, meetings, exhibits, and similar events, together with appurtenant property, including covered walkways, parking lots, or structures, necessary and convenient for use in connection with the convention facility. Convention facility includes an adjacent arena with a seating capacity not exceeding 10,000. Convention facility does not include an adjacent arena with a seating capacity exceeding 10,000. [MCL 141.1355(c).]

[4] The qualified convention facility consists of Cobo Hall, Cobo Convention Center and certain nearby parking garages.

[5] The statute defines a "qualified metropolitan area" as "a geographic area of this state that includes a qualified city, a qualified county, and the 2 counties bordering the qualified county with the largest populations according to the most recent decennial census." MCL 141.1355(l). It is undisputed that the city of Detroit is the qualified city in the qualified county of Wayne and the two bordering counties are Macomb and Oakland counties.

[6] The validity of the creation of the Authority is conclusively presumed because an original action was not filed with this Court within 60 days of January 20, 2009. MCL 141.1357(6).

The act specifies that the transfer of control over a qualified convention center would occur 90 days after an authority's creation, or in this case on April 20, 2009. MCL 141.1355(m). The transfer would only occur, however, "if the transfer is not disapproved as provided under [MCL 141.1369(1)]." *Id.* MCL 141.1369(1) provides, in pertinent part:

> Within 45 days of the effective date of this act . . . and prior to a transfer date, the *legislative body of the qualified city in which a qualified convention facility is located may disapprove the transfer of the qualified convention facility to the authority by adopting a resolution disapproving the transfer.* If the transfer is not disapproved, the qualified convention facility is transferred to the authority on the ninetieth day after the effective date of this act or the date on which a convention facility becomes a qualified convention facility. [Emphasis added.]

The act defines a "legislative body" as "the elected body of a local government possessing the legislative power of the local government." MCL 141.1355(f). In this case, the legislative body at issue is plaintiff Detroit City Council, which had a deadline of March 6, 2009, to disapprove the transfer of Cobo to the Authority. The transfer to the Authority would occur by operation of law on the ninetieth day after the effective date of the act, April 20, 2009, unless the transfer was disapproved.

On February 24, 2009, the city council passed a resolution to disapprove the transfer. On March 4, 2009, the mayor vetoed the resolution. The city council did not override the veto.[7]

---

[7] Under § 4-119 of the Detroit City Charter, the city council may reconsider a resolution vetoed by the mayor only at a regular meeting within one week of the mayor's veto. A two-thirds majority vote is required for an override.

The city council filed a complaint for injunctive and declaratory relief.[8] The city council maintained that it had the exclusive power to disapprove the transfer, arguing that the act's grant of exclusive power to it superseded the executive veto power provided to the mayor under the Detroit City Charter. Additionally, the city council stated that subjecting the disapproval resolution to mayoral veto would nullify the Legislature's intent to grant the power to disapprove exclusively to the city council.

The mayor answered that the Legislature did not intend to preclude the exercise of the mayoral veto power because it did not expressly do so. The mayor also relied on MCL 141.1359 of the act, where the Legislature expressly precluded the local legislative body from interfering with the local chief executive officer's power to appoint a board member to the Authority, to support his argument that the Legislature did not intend to preclude his exercise of a veto. The mayor argued that the legislative intent to allow a mayoral veto accords with the city's powers under the Home Rule City Act, MCL 117.1 *et seq.*

The circuit court granted the motion to intervene filed by the Detroit Building Authority, which owns substantial portions of Cobo. The Detroit Building Authority argued in part that the city council's disapproval resolution never became effective because of the mayor's veto and the city council's failure to override the veto.

After failed attempts to facilitate settlement between the parties, the circuit court issued a declaratory judgment that the mayor's veto was null and void. The circuit court ruled that, under the plain language of the

---

[8] Pursuant to discussions in chambers with the circuit judge, the parties agreed to argue only the request for a declaratory ruling.

act, if the city council rejects by resolution the transfer of authority, then the transfer does not occur. The circuit court relied on the doctrine of *expressio unius est exclusio alterius*, or inclusion by specific mention excludes what is not mentioned. The court noted that the act mentioned certain powers of the local chief executive, but did not mention the veto power. The court concluded:

> Thus, applying this maxim to the Act leads to the conclusion that the Legislature did not mean to provide the chief executive officer with the veto power over disapproval resolutions since, while the Act delineates several duties or powers of the chief executive officer, none of these include the power to veto a disapproval resolution, and the Act expressly confers on the legislative body alone the power to disapprove the transfer.

## II. THE PARTIES' ARGUMENTS

In Docket No. 291394, the mayor argues on appeal that the circuit court erred in construing the Legislature's silence as negating the existence of the mayoral veto power. The Legislature clearly stated that existing local government powers should be undisturbed and thus did not intend to disrupt the balance of existing legislative/executive branch powers. The circuit court should have liberally construed the act with a view toward harmonizing its provisions.

In Docket No. 291399, the Detroit Building Authority (DBA) contends that where the statute has no express provision to counter the mayoral veto power, the Legislature intended to preserve that power. The DBA argues that when the Legislature wanted to exclude a process of local government in the act it did so explicitly. Therefore, the DBA asserts that the resolution was nullified by the mayoral veto, which was never

overridden, and further argues that the act reflects the public policy of the state to promote tourism to the benefit of the state's residents.

The city council has filed a single response in both cases, asserting that the plain language of the act grants the city council exclusive power to disapprove the transfer. The act preempts local law, including the mayor's veto power.

### III. ANALYSIS

Whether the act grants a local chief executive officer the power to veto the disapproval by a legislative body is a question of law. This Court reviews statutory interpretation issues, which are questions of law, under a de novo standard. *New Properties Inc v George D Newpower, Jr, Inc*, 282 Mich App 120, 138; 762 NW2d 178 (2009). Further, we review de novo questions of law arising from a declaratory judgment action. *Guardian Environmental Services Inc v Bureau of Constr Codes & Fire Safety*, 279 Mich App 1, 5-6; 755 NW2d 556 (2008).

In interpreting statutes, courts give effect to the intent of the Legislature by reviewing the plain language of the statute itself. *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). When reviewing a statute, this Court considers the statutory language to determine if an ambiguity exists. *Western Michigan Univ Bd of Control v Michigan*, 455 Mich 531, 538; 565 NW2d 828 (1997). Where statutory language is ambiguous, judicial construction is permitted. *Deschaine v St Germain*, 256 Mich App 665, 669; 671 NW2d 79 (2003). Judicial construction is neither necessary nor permitted, however, where the statutory language is clear and unambiguous. *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 667; 760 NW2d 565 (2008). " 'In statutory interpretation,

the primary goal must be to ascertain and give effect to the Legislature's intent, and the judiciary should presume that the Legislature intended a statute to have the meaning that it clearly expresses.' " *McClellan v Collar (On Remand)*, 240 Mich App 403, 409; 613 NW2d 729 (2000) (citation omitted).

The question before this Court involves the act's delineation of power to the legislative body (the city council) and to the local chief executive officer (the mayor).[9] MCL 141.1369(1) specifies the single power of the legislative body—it may disapprove the transfer:

> Within 45 days of the effective date of this act ... and prior to a transfer date, the *legislative body of the qualified city in which a qualified convention facility is located may disapprove the transfer of the qualified convention facility to the authority by adopting a resolution disapproving the transfer*. If the transfer is not disapproved, the qualified convention facility is transferred to the authority on the ninetieth day after the effective date of this act or the date on which a convention facility becomes a qualified convention facility. [Emphasis added.]

In contrast, the act delineates several powers for the local chief executive officer. By way of example, the local chief executive officer of the city may appoint an individual to the five-member board of directors of the Authority. MCL 141.1359(1)(b). The local chief executive officer of a local government (which includes the city) is empowered to execute the relevant instruments and documents to accomplish the transfer of the qualified convention facility from the local government to the Authority. MCL 141.1369(3). Further, the local chief executive officer is required to take reasonable steps to terminate certain agreements between the government

---

[9] The act defines a "local chief executive officer" as including the mayor of a city. MCL 141.1355(g).

and others relating to the qualified convention facility. MCL 141.1369(12). Notably absent from this list of delineated powers is the authority to veto the legislative body's disapproval of the transfer.

Defendants ask this Court to interpret the Legislature's silence as bestowing a mayoral veto power that is not described in the statute. Should we adopt defendants' arguments and recognize a mayoral veto power over the city council's resolution, we would be nullifying MCL 141.1369(1), the only provision of the act that confers power on the city council. It is a well-established rule of statutory construction "that courts should avoid any construction that would render statutory language nugatory." *Flint City Council v Michigan*, 253 Mich App 378, 394; 655 NW2d 604 (2002). We therefore do not construe the statute in a manner that would render MCL 141.1369(1) a nullity.

We read the plain language of MCL 141.1369 to mean that the transfer is exclusively conditioned on the actions of the city council. If the city council does not disapprove the transfer, then the transfer will occur. Under the clear terms of the act, if a majority of the city council affirmatively votes to disapprove the transfer, then the transfer does not occur. Hence, once the majority of the city council voted to disapprove the transfer, the transfer could not be effectuated. Because the city council's vote was dispositive, the mayoral veto was, in essence, irrelevant. We therefore must reject defendants' argument that the mayoral veto invalidated the city council's resolution.

As quoted earlier, MCL 141.1369(1) provides that the appropriate "legislative body," in this case the city council, may disapprove the transfer. MCL 141.1369, the only section of the act involving disapproval, expressly provides only one entity, the legislative body,

with the power to disapprove the transfer. The sole statutory section relating to disapproving the transfer refers to the legislative body alone; it does not refer to the local chief executive officer. The Legislature presumably was aware that mayors often have general veto powers under their respective city charters or other local laws. Had the Legislature intended to give the local chief executive officer the power to veto the disapproval of the legislative body, it would have expressly done so. Similarly, had the Legislature intended for a mayoral veto, it would not have granted disapproval power solely to the city council.

Although defendants argue that, under this reasoning, the Legislature would have had to specify each and every power that the local chief executive officer could exercise related to the act, we disagree. The significance of the power to disapprove the transfer cannot be overstated: where disapproved, the transfer is null and does not occur. Given the importance of this power, we cannot assume that the Legislature overlooked the role of the local chief executive officer. The omission of a reference to a mayoral veto clearly indicates that the Legislature did not intend to provide for such a veto.

Defendants argue that no question exists that the Detroit City Charter grants the mayor the right and power to veto the city council's resolution. The Detroit City Charter provides in § 4-119 (Veto):

> Every ordinance or resolution of the city council, except quasi-judicial acts of the city council including any under section 9-302, appointments by the city council or action taken under section 2-107(2-3), 4-102, 4-105, 4-108, 4-109, 4-120, 7-1006, 12-110 of this Charter, shall be presented by the city clerk to the mayor within four (4) business days after adjournment of the meeting at which the ordinance or resolution is adopted.

Defendants argue that the mayor has the power to veto the resolution of the city council pursuant to this section of the charter.

However, the charter also provides for a limitation of powers:

> The city has the comprehensive home rule power conferred upon it by the Michigan Constitution, *subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute.* The city also has all other powers which a city may possess under the Constitution and laws of this state. [Detroit Charter, § 1-102 (emphasis added).]

The charter itself thus recognizes that it is subject to limitations imposed by statute.

Further, the city of Detroit is organized and operates under the Home Rule City Act. See Detroit Charter, § 1-101. The Michigan Constitution provides certain powers to home rule cities:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section. [Const 1963, art 7, § 22.]

Our Supreme Court has stated that this provision "specifically provides that ordinances are subject to the laws of this state, i.e., statutes." *AFSCME v Detroit*, 468 Mich 388, 410; 662 NW2d 695 (2003). Similarly, under the Home Rule City Act, the laws and ordinances relating to a home rule city's municipal concerns are

subject to the general laws of Michigan. See MCL 117.4j(3) (providing that a home rule city's ordinances are "subject to the constitution and general laws of this state"). In other words, where a city charter conflicts with a state statute, the statute controls in matters that are not solely a local concern. *Bd of Trustees of the Policemen & Firemen Retirement Sys of Detroit v Detroit*, 143 Mich App 651, 655; 373 NW2d 173 (1985).

Likewise, the principle of preemption demonstrates that ordinances may not conflict with statutes:

> "A municipality may not enact an ordinance if (1) the ordinance directly conflicts with the state statutory scheme, or (2) the state statutory scheme preempts the ordinance by occupying the field of regulation that the municipality seeks to enter, to the exclusion of the ordinance, even where there is no direct conflict between the two schemes of regulation. Preemption may be established (1) where state law is expressly preemptive; (2) by examination of the legislative history; (3) by the pervasiveness of the state regulatory scheme, although this factor alone is not generally sufficient to infer preemption; or (4) where the nature of the subject matter regulated demands exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest." [*Fraser Twp v Linwood-Bay Sportsman's Club*, 270 Mich App 289, 293-294; 715 NW2d 89 (2006) (citation omitted).]

Consequently, to the extent that the charter conflicts with the statute, the statute must prevail.[10]

---

[10] We also note that the mayoral veto power is not the only charter provision preempted by the act. The act also preempts § 4-112 of the Detroit City Charter, which provides: "Except as otherwise provided by this Charter, the city may not sell or in any way dispose of any property without approval by resolution of the city council." MCL 141.1369(10)(a) of the act preempts the city council's powers regarding the sale or disposal of property: "A local government . . . shall . . . [r]efrain from any action to sell, transfer, or otherwise dispose of a qualified convention facility . . . without the consent of the authority."

Indeed, the Regional Convention Facility Authority Act itself specifically preempts any charter provision contrary to the statute. MCL 141.1379(2) provides:

> The powers conferred in this act upon any authority or local government shall be in addition to any other powers the authority or local government possesses by charter or statute. *The provisions of this act apply notwithstanding any resolution, ordinance, or charter provision to the contrary.* [Emphasis added.]

Thus, while the first sentence of MCL 141.1379(2) does not restrict the powers conferred on the local government, the second sentence indicates that its provisions "apply notwithstanding any resolution, ordinance, or charter provision," which would include the Detroit City Charter. The act thereby prevails over the charter pursuant to its own terms. We also are not convinced, as argued by defendants, that the first sentence of MCL 141.1379(2) preserves any power for the mayor. It is limited to "any authority or local government." The act specifically defined each of those entities, neither of which definitively includes the mayor; the mayor instead falls under the definition of "local chief executive officer." Because the first sentence of MCL 141.1379(2) is silent with respect to preserving any mayoral powers, defendants' argument on this point fails.

It follows that, if the charter provision conflicts with or contravenes the act, then the charter is subject to the act. The charter provision regarding the veto conflicts with the act, which provides that only the city council has the authority to disapprove the transfer and provides no authority to the mayor to veto the disapproval resolution. The charter cannot override the act—by its own terms, the charter is subject to "limitations on the exercise of . . . power . . . imposed by statute." Detroit Charter, § 1-102. Additionally, in the event of a conflict,

the act, as a statute more specific to the transfer of authority, prevails over the Home Rule City Act, a general statute. " '[I]t is a settled rule of statutory construction that where a statute contains a specific statutory provision and a related, but more general, provision, the specific one controls.' " *Odom v Wayne Co*, 482 Mich 459, 471; 760 NW2d 217 (2008) (citation omitted).

Defendants argue that the circuit court's application of the doctrine of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) was in error. The doctrine of *expressio unius est exclusio alterius* "does not subsume the plain language of the statute when determining the intent of the Legislature." *Tuggle v Dep't of State Police*, 269 Mich App 657, 664; 712 NW2d 750 (2006). It has been described as "a rule of construction that is a product of logic and common sense." *Hoerstman Gen Contracting Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006). The doctrine characterizes the general practice that " 'when people say one thing they do not mean something else.' " *Feld v Robert & Charles Beauty Salon*, 435 Mich 352, 362; 459 NW2d 279 (1990) (opinion by RILEY, C.J.), quoting 2A Sands, Sutherland Statutory Construction (4th ed), § 47.24, p 203. The act expressly gives the city council authority to disapprove the transfer. Nowhere in the statute is there a similar provision that grants the mayor comparable authority. In other words, under the doctrine of *expressio unius est exclusio alterius*, the Legislature's expression of the city council's disapproval power operates to exclude a mayoral veto power of that disapproval.

In support of their position, defendants rely on MCL 141.1359(4), which provides an example where the Legislature expressly discussed the interplay between the mayor and the city council:

Each officer [which includes a local chief executive officer] appointing a board member under this section shall file the appointment with the secretary of state and the county clerk of each county in the qualified metropolitan area. *Notwithstanding any law or local charter provision to the contrary, appointments by an officer are not subject to approval or rejection by a legislative body.* [Emphasis added.]

The Legislature thus explicitly directed that the city council did not have the authority to approve or reject the mayor's selection for appointment. Defendants argue that, had the Legislature wished to curb the mayor's power, it would have done so in a similar passage in MCL 141.1369. Where the Legislature did not do so, defendants reason, the mayor's veto power stands. While it is true that statutory provisions are to be read in total to produce a "harmonious whole," *Hill v L F Transportation, Inc*, 277 Mich App 500, 507; 746 NW2d 118 (2008) (citation omitted), to adopt defendants' reading would serve to negate MCL 141.1369(1).

We also cite as persuasive the dissent in *Raven, Inc v City of Southfield*, 69 Mich App 696; 245 NW2d 370 (1976), rev'd for the reasons stated in the dissent 399 Mich 853 (1977). The plaintiff in *Raven* sought a declaration that the mayor of Southfield did not have the authority to veto the city council's approval of a class C liquor license. The statute governing liquor licenses provided at that time that approval was to be by "the local legislative body in which said applicant's place of business is located before being granted by the commission . . . ." MCL 436.17.[11] The circuit court construed the statute as rendering invalid the mayor's veto. A majority of this Court reversed, with Judge DANHOF dissenting. *Raven*, 69 Mich App at 702. The

---

[11] That statute was repealed by 1998 PA 58. See MCL 436.2301(a).

Michigan Supreme Court reversed for the reasons provided in the dissent. *Raven, Inc v City of Southfield,* 399 Mich 853 (1977). Judge DANHOF opined in that dissent that the statutory language was clear and unambiguous and thus not subject to construction, observing that "[n]othing could be plainer than the term 'legislative body,' as employed in this context." *Raven,* 69 Mich App at 703. Judge DANHOF observed that, although the Legislature could have used the terms "local unit of government" or "local legislative body and executive," the Legislature did not do so. *Id.* at 703-704. He reasoned that the term "legislative body" has only one plain meaning, to which the Court was bound to adhere. *Id.* at 704.

We find that reasoning to be sound. In this instance, not only does the statute employ the plain and unambiguous term "legislative body," it also clearly defines that term as the "elected body of a local government possessing the legislative power of the local government." MCL 141.1355(f). It is undisputed that the city council is the relevant legislative body in this case. The statute specifically confers on the legislative body the authority to disapprove the transfer. It does not confer the power to disapprove to both the legislative body and the executive. In accordance with the dissent in *Raven,* this Court is bound by the plain statutory language.

Likewise, in *Livonia Hotel, LLC v City of Livonia,* 259 Mich App 116; 673 NW2d 763 (2003), the mayor of Livonia vetoed the city council's approval of a waiver use petition brought by the plaintiff. The plaintiff sought a declaratory judgment regarding the veto; the circuit court ruled that the veto was valid as the council's attempt to override it was one vote short. This Court observed that the Livonia Charter granted broad veto power to the mayor, while the Livonia Zoning

Ordinance was silent regarding the role of the mayor in the approval process. *Id.* at 132-135. Further, the zoning ordinance provided that the planning commission must first review an application for waiver use, then make a recommendation to the city council for the ultimate decision. *Id.* at 135.

This Court ruled that two sections of the Livonia Zoning Ordinance, when read together, demonstrated that the city council was the ultimate decision maker regarding waiver uses. Admittedly, the charter granted broad veto power to the mayor, but the zoning ordinance did not expressly provide for a mayoral veto. This Court decided that the trial court had erred in concluding that the mayor had veto power where the city council did not provide for a mayoral veto when enacting the pertinent ordinances. *Id.* at 136-137.

This Court went on to note the legislation's "complete silence" regarding the mayoral veto:

> The complete silence of the [Livonia Zoning Ordinance] regarding mayoral veto power of the waiver use decision of the Livonia City Council requires a judicial adherence to the state statute on the matter before this Court. The city officials in Livonia may wish to specifically provide for mayoral veto power in the future. But, the stark omission of such power is in sharp contrast with the specificity required by MCL 125.584a(1)(a) and (c)[12] with which the Livonia City Council adhered consistently. [*Id.* at 137.]

In comparison, the Regional Convention Facility Authority Act plainly provides that the legislative body makes the ultimate decision regarding disapproval of the transfer. The act does not explicitly provide for a mayoral veto with regard to the disapproval, despite the fact that the Detroit City Charter affords broad veto power to the mayor. Where the Legislature did not

---

[12] 2006 PA 110 repealed MCL 125.584a. See MCL 125.3702(1)(a).

provide for a mayoral veto in the act, the circuit court here correctly concluded that the mayor did not have the authority to veto the city council's disapproval.

We do not find persuasive the cases relied on by defendants: *Harbor Telegraph 2103, LLC v Oakland Co Bd of Comm'rs*, 253 Mich App 40; 654 NW2d 633 (2002), and *Oakland Co Comm'r v Oakland Co Executive*, 98 Mich App 639; 296 NW2d 621 (1980). *Harbor* involved the Oakland County Executive's veto of the board of commissioners' resolution to schedule a detachment election. This Court reversed the circuit court's determination that the veto was invalid, ruling that the Legislature had explicitly restricted the county executive's veto power to four limited instances. Those restrictions clearly reflected a legislative intent that the county executive otherwise had broad authority to veto the commissioners' resolutions. *Harbor*, 253 Mich App at 54-55. In contrast, the legislative intent here is reflected in the grant to the city council of the sole authority to disapprove the resolution. No statutorily authorized veto power exists: unlike the *Harbor* county executive's veto power, which was granted by statute, here the mayoral veto power exists by city charter. When the state statute otherwise is silent regarding the mayoral veto power, we cannot recognize a power that the Legislature clearly did not provide.

The Court in *Oakland Co Comm'r* was not faced with a conflict between a statutory enactment and veto powers bestowed by a city charter. Indeed, the Court found no conflict whatsoever between the competing provisions. As described at length earlier, a conflict exists here. Moreover, the concurring judge in that case noted that the contested veto power was the result of the Legislature's "explicit consideration," *Oakland Co*

*Comm'r*, 98 Mich App at 656 (DANHOF, C.J., concurring), which is not the situation before this Court.

Our decision that the mayor did not have the statutory authority to veto the city council's disapproval makes unnecessary further analysis of the public policy issues raised by defendants. We merely note that the question posed in this case is not whether the transfer "should," as a matter of public policy, occur on April 20, 2009; rather, the sole question before the Court is whether the act permits a mayoral veto given the plain language of the statute. Despite the stated policy aims of the statute, we cannot rule on policy grounds in contravention of the plain language of the statute. To the extent that the issues presented relate to public policy matters, the making of social policy generally is for the Legislature, not the courts. *Van v Zahorik*, 460 Mich 320, 327; 597 NW2d 15 (1999).

### IV. CONCLUSION

We conclude that the circuit court did not err in deciding that the act does not provide for a mayoral veto of the city council's resolution to disapprove the transfer. We are constrained to abide by the plain terms of the act and thus cannot provide the broad reading of the statute proffered by defendants. We decline defendants' invitation to read into the statute a power that is not expressly stated.

Affirmed.