HAYES CONSTRUCTION COMPANY *v.* SILVERTHORN.

1. FRAUD—SALESMAN'S "PUFFING"—LOW-DRAFT FURNACES.

Assertions of furnace salesman that his low-draft furnace was miserly in the consumption of fuel and that the maintenance was nil constituted praise of his product which involved matters of estimate or judgment upon which reasonable men may differ, are termed "puffing," and do not constitute actionable fraud even though the vendee's realization falls short of his anticipation.

2. SALES—SPECIAL KNOWLEDGE OF SELLER.

A seller who has special knowledge of a product and a buyer with none and without any means of getting it and, therefore, unable fairly and reasonably to exercise his own judgment, do not stand on equal terms and the buyer has a right to rely upon the representations of excellence made by the seller.

3. SAME—RELIANCE ON SALESMAN'S REPRESENTATIONS.

Experienced builder *held,* not to have relied upon furnace salesman's representations that his furnace would use only a stated amount of fuel on an average heating day and that maintenance would be nil, such statements being obviously void of persuasive meaning.

4. APPEAL AND ERROR—NONJURY CASE—PREPONDERANCE OF EVIDENCE—FRAUD.

The Supreme Court does not reverse the judgment of the trial court in a nonjury case unless it is against the preponderance of the evidence, especially in a fraud case, where the trial judge has seen and heard the witnesses who presented conflicting testimony.

REFERENCES FOR POINTS IN HEADNOTES

[1] 23 Am Jur, Fraud and Deceit § 33; 46 Am Jur, Sales § 89.
[2] 46 Am Jur, Sales § 100.
[3] 46 Am Jur, Sales § 98.
[4] 3 Am Jur, Appeal and Error § 896.

5. Same—Finding—Model of Furnace—Preponderance of Evidence.

Trial court's finding in nonjury action for fraud that defendant furnace salesman had not represented that plaintiff was to get one rather than another model of furnace he sold *held*, not against the preponderance of the evidence.

6. Same—Low-Draft Furnaces—Findings of Court—Evidence.

Finding of trial court that cause of failure of defendants' low-draft furnaces to function properly in housing units constructed by plaintiff was because an incinerator in an adjoining unit was connected with the same chimney and interfered with the draft *held*, supported by the testimony and not contrary to the preponderance of the evidence.

7. Contracts—Low-Draft Furnace Installer—Chimney Draft.

Furnace installer *held*, entitled to recover balance unpaid on its contract for installation of low-draft furnaces in housing units with interest, where it had functioned solely as installer and relieved itself of responsibility for chimney draft by providing in its contract that the owner was to be responsible therefor.

Appeal from Wayne; Maher (Thomas F.), J. Submitted June 8, 1955. (Docket No. 9, Calendar No. 46,490.) Decided October 3, 1955.

Case by Hayes Construction Company, a Michigan corporation, against Harry Silverthorn and Howard Waters, copartners doing business as the Waters Company, and Buhl Sons Company, a Michigan corporation, for fraud and breach of contract on the sale and installation of furnaces in housing project. Cross declaration by the Waters Company for balance due on installation. Judgment for defendants. Plaintiff appeals. Affirmed.

*Dykema, Jones & Wheat* (*Thomas L. Munson* and *Allan Neef,* of counsel), for plaintiff.

*Thomas Roumell,* for defendant Waters Company.

*Wurzer, Higgins & Starrs* (*John R. Starrs,* of counsel), for defendant Buhl Sons Company.

SMITH, J. This case involves charges of fraud and breach of contract. It arises out of the defective performance of a number of Coleman furnaces.

The plaintiff is the Hayes Construction Company, a Michigan corporation. The moving party therein, the sole stockholder, is Milton Ratner. "Actually I am Hayes Construction Company." Accordingly, when we hereafter speak of what Ratner said or what Ratner knew or what Ratner did, it may be understood that his corporate creature, plaintiff herein, spoke the same words, possessed the same knowledge, and undertook the same actions. Ratner is a builder of long experience. He started in the business in 1916 and has since remained in it. During that time he has constructed thousands of houses and, at the time of the trial, had just completed "building a portion of the Jeffries and Douglas housing projects for the city for about $4,200,000."

Ratner (Hayes Construction Company) was the general contractor for block 1 of Lake Shore Village, a group of 121 separate apartments, contained in 13 separate buildings. Each apartment was to have a separate furnace. When it became known in business circles that such an order would soon be forthcoming, Ratner was approached by many persons who attempted to interest him in their products. Among such persons was Arthur L. Johnson, Jr., at that time department manager for defendant Buhl Sons Company's heating division. Mr. Johnson extolled the virtues of the Coleman furnace. "I told him that the Coleman furnace would do the job for him." As proof thereof, Johnson pointed to a similar project, the Goddard project, where he himself lived, which employed Coleman furnaces, and, in .fact, he invited Ratner to visit the project to see how the furnaces worked. The invitation was declined, but the information thus conveyed was utilized. Ratner did in fact telephone the owner of the

Goddard project and learned from him of the successful performance of the Coleman furnace. He obtained, in addition, the name of the contractor who installed the furnaces, with whom he also talked. Again he received a favorable report, particularly as to maintenance costs. Despite the magnitude of the expenditure (approximately $50,000 for the furnaces) he did not discuss the contemplated installation with his architect. What, then, influenced him to decide on the Coleman product? As Ratner explains: "That the maintenance was nil, and that they were a reasonable priced furnace, and they did the job I wanted." When Johnson came back he was informed of Ratner's inquiries and his decision. "I find out that those furnaces are satisfactory and if you can put those same furnaces in my unit to my satisfaction, I will be happy about it, and you will get the rest of the job after these 121 units." Johnson replied: "We can do it." The project went forward.

Defendant Buhl Sons Company, however, did not sell directly to the consumer. It sold to dealers and heating contractors, one of whom was defendant Waters Company. This company suggested that it could furnish a better furnace than the Coleman, but Ratner insisted that that was the make he wanted and he asked for their bid, exclusive of service, on the Coleman model 90-A, this model number having been supplied by Johnson. Waters' bid was low and they got the job. Work began in September of 1948.

Trouble with the furnaces was experienced from the outset. We will not burden the record with technical descriptions of the difficulties encountered. They were manifold, numerous, and, apparently, baffling. Ratner consulted with Waters and with Buhl. Waters said that they had received the furnace as a packaged unit, had started it running with

the equipment that was on it and they pointed out that their contract did not cover the servicing of the equipment. Buhl's representatives investigated the situation but denied responsibility. It did not, in fact, maintain a service department for Coleman products, although its mechanics at times assisted the factory representatives. The Coleman company itself, however, which had warranted the furnaces, having been notified both by Buhl and Ratner of the difficulties being encountered, sent men to Detroit to work on the problem. They spent approximately 6 weeks in Detroit, and made various changes, but the performance of the furnaces remained unsatisfactory. It was the opinion of Coleman's sales manager of the heating equipment division that the difficulties at the Lake Shore Village, "the principal problem that was out there was the matter of correcting the draft. And the draft problem was created by the incinerator." (The same chimney served the furnace in one apartment and the incinerator in the adjoining apartment.) As far as the difference between model 90 and model 90–A was concerned, he said, there was very little. The burners were essentially the same and the draft characteristics exactly the same. They were what is known in the trade as low-draft furnaces.

We will first examine the charge of fraud against defendant Buhl. Ratner, it is asserted, was over his depth with salesman Johnson and was cozened into an improvident purchase by the arts and wiles of deceit. Thus he relied upon Johnson's false and fraudulent or reckless (*Wettlaufer Manufacturing Corporation* v. *Detroit Bank,* 324 Mich 684) assertions that the Coleman furnace would do the job, that its average final consumption was thus and so, and that its maintenance was nil. But Johnson's duplicity, it is asserted, did not stop here. For, it is said, he knew that the furnaces in the Goddard

project bore a certain model number (90), but he, with this knowledge, either knowingly or recklessly supplied Ratner with another model number 90–A. It is, says plaintiff, just as though he were shown and purchased a corner lot, only to have some other lot description placed in the deed. *Smith* v. *Michigan Realty & Construction Co.*, 175 Mich 600.

So far as Johnson's assertions as to the merits of the Coleman furnace, that it would do the job, that it was miserly in its consumption of fuel, and the maintenance nil, we are here in the realm of what the common law has for years termed "puffing," a salesman's praise of his own property, involving matters of estimate or judgment upon which reasonable men may differ. Ordinarily these are not regarded as actionable, even though the vendee's joys of realization fall short of those of his anticipation. The reason for this lies in the realities of commercial intercourse. As Judge Learned Hand put it in *Vulcan Metals Co.* v. *Simmons Manufacturing Co.* (CCA), 248 F 853, 856:

"There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth."

See, also, *Truman* v. *J. I. Case Threshing Machine Co.*, 169 Mich 153; *Camden Fire Insurance Co.* v. *Peterman*, 278 Mich 615, 619.

The relationship of the parties may, however, impose more stringent requirements. One party may have special knowledge and the other none and without the means of getting it. In this case the latter

cannot fairly and reasonably exercise his own judgment. The parties, therefore, do not stand on equal terms and the buyer has a right to rely upon the representations of excellence made by the seller.

In the case at bar, appellant urges upon us that we are in the above area of fraud, that Ratner "clearly was not on a par with Johnson, and this is particularly true where the Coleman furnaces were concerned." It is pointed out to us that Ratner knew very little about furnaces, nothing about Coleman furnaces, and that he had "never installed a furnace in his life." Nevertheless, we share the reluctance of the trial court in accepting Mr. Ratner as the gullible and trusting buyer pictured to us. His experience in building was substantial. In this part of the country heating plants are an integral part of habitable construction. Nor did he stand alone and unprotected. He had a professional adviser— an architect. It is clear that he did not rely blindly, if at all, upon Buhl's representations. He prudently checked them, not only with another owner but with another heating contractor. Means of knowledge were open to him and the degree of their utilization was circumscribed in no respect by defendant Buhl or its agent, Johnson. As a matter of fact, the extent of Ratner's trust in Johnson, as described to us, challenges our credulity. He was told by Johnson, he says, that "the maximum fuel consumption would be 5–1/2 gallons per average heating day." This, it is asserted, was a representation, both false and material, known to be such, or recklessly made, and upon it Ratner relied, to his sorrow and his loss. But it would seem that upon even the most casual reflection such a statement, if made, would be totally devoid of persuasive meaning. Even if we define an "average" heating day in some reasonable manner (as to which the record is silent) the oil consumption on such a day would obviously depend upon the

needs of the individual household. Are there infants in the family? Old people? Is the housekeeper careful about keeping the apartment doors and windows closed? Johnson flatly asserts that it would be impossible to give an actual gallonage rate per day and that he did not do so.

The matter of the allegedly misrepresented model number stands on a different footing, assuming (which is far from proved) that engineering and design differences in the 2 models would account for a satisfactory performance by the one and no performance by the other. Here is a statement of positive fact, not opinion. We are out of the realm of trader's talk. But the evidence with respect thereto is conflicting. Johnson asserts that at the very outset in their first meeting, he discussed with Ratner the difference between model 90 and model 90–A, stating that the former was being successfully used in the Goddard project, but that it was being discontinued and that an improved model, the 90–A, would be used in the contemplated project. Ratner, on the other hand, asserts that it was not until a year and a half after the installations were made that he became aware that 2 different models were made, the 90 and the 90–A. The trial court's finding, on this point, goes to the heart of this phase of the controversy, the conclusion being that Johnson did not represent to Ratner that the latter was getting model 90 furnaces. We cannot agree with appellant that the trial court's conclusion should not be allowed to stand. We deem it pertinent to observe, in this respect, that in a case tried to the court without a jury, we do not disturb the judgment of the court unless it is against the preponderance of the evidence. *Jones* v. *Eastern Michigan Motorbuses,* 287 Mich 619. Such judicial restraint is peculiarly appropriate to a fraud case. The trier of the facts in such a matter has an inestimable advantage over the

appellate tribunal.   The hesitant word and the
averted glance stand on a parity, on the printed page
before us, with the positive assertion and the forth-
right expression.   Not so in the mind and conscience
of the *nisi prius* judge.   He makes his appraisal of
truth or falsity upon an evaluation of all the ele-
ments visible and audible, and while cases may
occur in which his disregard for the clear preponder-
ance is manifest even in these chambers, this case is
not one of them.   Much expert testimony was taken
as to the cause or causes of the difficulties experi-
enced.   The experts do not agree.   The trial court's
conclusion was expressed in the following lan-
guage:

"Mr. Johnson and Mr. Marx testified that the real
reason that there was difficulty with these particular
units in this particular housing project was because
of the high draft of the chimneys in the various
units, which condition was aggravated and made still
higher when the incinerator units, which were placed
on the same flues, went into operation, and especially
when the incinerator doors were left open. The evi-
dence reveals that these chimneys in this project
were large ones with an incinerator connected with
each chimney, and with the incinerator in operation
the chimney temperature was raised and the draft
correspondingly increased.   Both of these furnaces,
whether model No 90 or model No 90–A, were known
in the trade as low-draft furnaces."

Even plaintiff's expert, Mr. Jordan, conceded that
joining the furnace exhaust to a flue which was also
connected with an incinerator would "interfere with
the draft," although as to the extent and effect of
such interference he differed vigorously with defend-
ant Buhl's witnesses.   With respect to the trial
court's conclusion, quoted above, appellant asserts
that "the finding by the trial court that the chimney

draft was responsible for the defective operation of the Coleman model 90–A furnaces installed in Lake Shore Village was contrary to the preponderance of the evidence." We cannot agree. In our opinion the trial court was amply justified in its finding by the evidence adduced and it is not contrary to the preponderance thereof.

It remains to consider the charges made against Waters, the heating contractors who installed the furnaces. The case against Waters rests upon the foundation that, under its contract with plaintiff, prepared by plaintiff on standard printed forms, it "is the guarantor not only of the installation of the furnaces, but also of the furnaces themselves." Waters denies liability, asserting not only plaintiff's failure to give certain allegedly required notices (of defects and claims) but also that it "merely did what plaintiff requested," that is, installed the furnace model prescribed by plaintiff and, hence, should not be held liable for its malfunctioning. The question of whether or not one prescribing a certain machine thereby assumes the sole responsibility and risk for its operation, notwithstanding its guaranty by the furnisher thereof, we do not reach. The cause of the difficulties experienced, as noted above, was defective chimney draft. This was precisely the area in which Waters had relieved itself of responsibility. "Owner," Waters had added to the printed provisions of the subcontract, "is to be responsible for chimney draft." Responsible, it is reasonable to conclude, not only for the draft itself but for consequences flowing therefrom or from lack or abundance thereof. In view of the provision, we cannot saddle Waters with the cost of the debacle and the partnership should, we agree with the trial court, recover the amount unpaid on its contract, with interest.

.. We find no merit in the remaining contentions of appellant. The judgment of the lower court is affirmed. Costs to appellees.

.. CARR, C. J., and BUTZEL, SHARPE, REID, DETHMERS, and KELLY, JJ., concurred with SMITH, J.

BOYLES, J., concurred in the result.