NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0055n.06

No. 10-2116

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Jan 13, 2012*

LEONARD GREEN, Clerk

KAREN NEMIER; KAREN NEMIER INSURANCE AGENCY, INC.,

    Plaintiffs-Appellants,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, an Ohio Corporation,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before: KETHLEDGE and STRANCH, Circuit Judges; GWIN, District Judge[*]

KETHLEDGE, Circuit Judge. Former Nationwide insurance agent Karen Nemier appeals the district court's decision to enter summary judgment for Nationwide on her fraud and breach-of-contract claims. She argues that material factual disputes remain as to whether Nationwide fraudulently induced her to take out loans to open a new insurance agency. We disagree and affirm.

I.

In 1998, Nationwide gave Nemier money to start her own insurance agency in Plymouth, Michigan. Nemier sold Nationwide insurance through her agency, but ran the agency as an independent contractor starting in 2002. In 2003, Nationwide announced its goal to become the third

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

largest insurer in the country. To that end, Nationwide planned to implement a new ratings system in Michigan, called "Class Plan M." Under Plan M, Nationwide would more precisely calibrate its insurance rates according to the risk presented by each customer, supposedly making the rates more competitive. Nationwide also encouraged agents like Nemier to open additional satellite offices. To help open the new offices, Nationwide offered its agents "capital access loans" under which Nationwide would waive repayment of the loan if the agent met certain growth targets.

Nemier told a Nationwide sales manager that she was interested in opening another satellite in Hartland, Michigan. Nemier added that she was "extremely busy" and "didn't know when [she] could get a whole business plan done" for the new office. The manager responded that a Nationwide business consultant "would take care of the majority" of the work.

Nationwide's business consultant prepared the pro forma with little input from Nemier. He projected revenue increases after Nemier opened the new office, predicting that the office would have positive cash flow in three years. The consultant also prepared a demographic summary that classified Hartland as a "target expansion market."

Another Nationwide employee warned Nemier that there had been problems with the rollout of Plan M in other states. But in June 2004 Nemier took out a $100,000 capital-access loan from Nationwide Federal Credit Union to open a Hartland office. In doing so, she allegedly relied on the consultant's two studies and Nationwide's promises that, considering her past success, she would likely achieve certain growth targets necessary to avoid repaying the loan. Those growth targets included a requirement that the sum of her "direct written premiums" exceed 150% of Nationwide's "state growth objectives" for those premiums within three years. The targets also required Nemier

to increase her direct written premiums by $1,005,955 within three years. Nemier opened her Hartland office in July or August 2004.

In April 2005, Nemier borrowed another $10,000 from Nationwide Federal Credit Union to pay for advertising. As before, she could avoid repayment if her direct written premiums exceeded 150% of Nationwide's state-growth objective and if she produced an additional $100,000 in direct written premiums, all by December 31, 2005.

Sometime in 2005, Nemier learned that Nationwide was selling insurance directly to Michigan residents, creating competition for agents like her. In at least one instance, Nationwide cancelled an insured's policy with Nemier and rewrote the policy directly with Nationwide. Nemier also learned that a Nationwide subsidiary called Allied was offering similar insurance to Michigan residents, but at a lower price.

Nationwide's Class M program was unsuccessful. Rather than making Nationwide's rates more competitive, its rates climbed and Nationwide lost policyholders. Nemier closed the Hartland office in October 2006. Her profits dropped from $215,000 in 2006 to $92,157 in 2007. She missed the growth targets in her loan agreements by 7%. *See* R. 58, Attach. 1 at 28. Nemier resigned from Nationwide in 2008.

Nemier later sued Nationwide for fraud, breach of contract, and violation of Michigan's franchise-investment law. The district court granted summary judgment to Nationwide. Nemier appeals as to the fraud and breach-of-contract claims.

II.

In Nemier's view, a genuine issue of material fact exists because a reasonable jury could conclude, by clear and convincing evidence, that Nationwide committed fraud under any one of three theories.

1.

Nemier's first theory of fraud is that Nationwide fraudulently induced her to borrow money to open the Hartland office by promising to lower its rates in Hartland to encourage growth. *See generally Elliott v. Therrien*, No. 288235, 2010 WL 293071, at *5 (Mich. Ct. App. Jan. 26, 2010). To support this allegation, Nemier points to a single sentence in the 2004 demographic study, saying that Hartland was a "target expansion market." She also points to testimony by Nationwide employee Renelle Smith that Nationwide's agents believed that Plan M would generally result in more "competitive" rates. But these statements are not promises to lower Nationwide's rates in Hartland. Moreover, Nationwide's alleged promise to lower rates could only have been fraudulent if Nationwide intended to break that promise from the outset. *See Diamond Computer Sys., Inc. v. SBC Commc'n, Inc.*, 424 F. Supp. 2d 970, 981 (E.D. Mich. 2006). Nemier has no evidence of any such intent. Her false-promise theory therefore fails.

2.

Nemier's second theory of fraud is that Nationwide induced her to take out the capital-access loans by making two projections relating to her business that were so optimistic as to be dishonest. She alleges that Nationwide told her that Plan M would be an engine for growth. She also asserts that Nationwide told her that her business was very likely to grow enough to meet her loan-waiver

targets after opening the Hartland office.

Financial projections can be fraudulent if the projections are based on misrepresentations about past or present facts. *See Mesh v. Citrin*, 300 N.W. 870, 534 (Mich. 1941). For example, the *Mesh* court held that a jury could conclude that a gas station seller's projection that his station would earn $50 a week was fraudulent because the station was in poor condition at the time of sale. *Id.* at 534, 537. But Nemier's allegations fall outside that rule.

Nemier points to two pieces of evidence that purportedly show that Nationwide made overly optimistic projections that Plan M would drive growth. She cites Nationwide's generalized statements that Class M would succeed, including an email saying the company is "excited and optimistic" about Plan M. But such statements are puffery, not fraud. *See Webb v. First of Mich. Corp.*, 491 N.W.2d 851, 853 (Mich. Ct. App. 1992). Nemier also cites a Nationwide employee's deposition testimony, after the fact, that it would have been "inaccurate" for Nationwide to tell agents that Plan M would make them more competitive without supporting documentation. *See* R. 60, Attach. 4 at 6. But that employee was only saying that changes in rates do not always result in growth, not that Nationwide knew that Plan M was likely to fail based on data available when Nationwide was projecting success. *Id.* Even more to the point, Nemier admits that a Nationwide employee actually warned her about Plan M's possible problems when she was deciding whether to open the new office. That admission fatally undermines her assertion that Nationwide misled her about Plan M's prospects for success.

Concerning Nationwide's predictions that Nemier's business would grow enough to meet the loan-waiver targets, Nemier relies on three pieces of evidence to show fraud. First, she notes that

Nationwide's pro forma for the Hartland office projected that her business would see positive cash flow within three years, yet a Nationwide employee later testified in a deposition that it "takes five to seven years for a satellite or any storefront to be cash flow positive." *See* R. 60, Attach. 3 at 9. But the employee was not talking about Nemier specifically, who undisputedly was an unusually successful agent. Moreover, Nemier admits that Nationwide warned Nemier that she "could not compete in the standard market in [Hartland] and that her win rate would be very low."

Second, Nemier contends that Renelle Smith, who reviewed problems with the capital-access-loan program, said that Smith "knew" (Nemier's word) in 2004 that "a loan waiver was not likely to happen" and that Nationwide was spreading "misinformation" about the program to agents. But Smith merely said that she had a "hunch" about the loan-waivers in general, not about Nemier's loans in particular. And Nemier takes Smith's statement about "misinformation" out of context: Smith did not say that Nationwide was deliberately misleading agents about the program; instead, she said that the Nationwide employees who pushed the loans did not fully understand them. *See* R. 60, Attach. 3 at 13. Moreover, the "misinformation" that Smith mentioned was about the "interpretation" of the loan program, not the prospects for growth. *Id.* Smith's testimony therefore would not support a finding of fraud.

Third, Nemier contends that Nationwide should have known that she would fail to meet the growth targets in her loan agreements because internal records showed that the frequency of loan-waivers was rapidly declining between 2002 and 2004. But that decline does not tell the whole story: Between 2002 and 2003, the number of full loan waivers doubled. And there were still more loan waivers in 2004 than in 2002. Moreover, waiver was not unrealistic in Nemier's case: She

admits that she met 93% of her goals. Thus, this data does not show that Nationwide lied in its predictions that Nemier would meet her growth targets. Nemier has failed to support her allegation that Nationwide fraudulently induced her to take out loans by offering overly optimistic projections of growth.

3.

Nemier's third theory of fraud is that Nationwide committed "silent fraud" by failing to disclose (i) the data about declining waiver rates and (ii) Nationwide's plans to compete with its agents directly and through Allied. *See generally U.S. Fidelity and Guaranty Co. v. Black*, 313 N.W.2d 77, 87–88 (Mich. 1981). She notes that Michigan law requires a party to disclose its own "special knowledge" when another party is "without the means of getting it" and the parties "therefore[] do not stand on equal terms." *Hayes Constr. Co. v. Silverthorn*, 72 N.W.2d 190, 193 (Mich. 1955). But the "special knowledge" must be knowledge on which the ignorant party "would naturally rely." *See In re Allied Supermarkets, Inc.*, 951 F.2d 718, 725 (6th Cir. 1991). As explained above, the data about declining waiver rates does not tell the whole story. Moreover, Nemier says little about the scope of the competition from Allied and Nationwide; and that makes it impossible to gauge whether that competition constituted a change in Nationwide's business plan upon which Nemier would have "naturally relied" when deciding whether to open the Hartland store. More importantly, the "special knowledge" rule typically does not apply where, as here, the parties are both sophisticated, knowledgeable business people or where there is no evidence one party actively sought to conceal information. *Compare Hayes Constr. Co.*, 72 N.W.2d at 193 *with In re Allied Supermarkets*, 951 F.2d at 725. Finally, Nemier knew that Nationwide could make business decisions

adverse to her interests, without warning, because she signed a contract authorizing Nationwide to do precisely that. *See* R. 53, Attach. 4 ("It is understood and agreed that . . . each Company retains the right to change, alter or amend terms under which it will insure risks, and [can] change, alter or amend such rules, regulations, prices, and terms, including the right to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so, and without notice to or consent of the Agent").

Nemier points to no other "legal or equitable duty" on Nationwide's part to disclose its internal statistics and plans to compete with its agents. *Black*, 313 N.W.2d at 88. Thus the district court was correct to reject Nemier's silent-fraud theory.

4.

Nemier also seeks to revive one of her breach-of-contract theories. (She mentions another theory only in passing, so she has waived it.) She alleges that Nationwide promised to use money it owed her upon her retirement to pay off her loans immediately rather than in allotments. She complains that the failure to pay off her loans at once increases her interest payments. But the "contract" she relies upon is an agreement between Nemier and Nationwide Federal Credit Union—which is not a party to this case. Nemier acknowledges that the credit union is a subsidiary of Nationwide Mutual Insurance and points to no exception to the usual rule in Ohio (whose law governs the agreement) that parent corporations are not liable for the obligations of their subsidiaries. *Cf. Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1086 (Ohio 1993) (stating Ohio rule for piercing the corporate veil); *Pottschmidt v. Klosterman*, 865 N.E.2d 111, 120–21 (Ohio Ct. App. Dec. 29, 2006) ("We initially acknowledge . . . that a simple breach of

contract is not sufficient to pierce the corporate veil"). Moreover, Nemier does not dispute that the "contract" is actually a promissory note to the credit union—as it is labeled—and that she, as the promisor, therefore has no power to enforce it. *See* O.R.C. § 1303.31.

\* \* \*

The district court's judgment is affirmed.