*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BEKUM AMERICA CORP,

        Plaintiff/Counterdefendant-Appellee,

v

SCANTIBODIES LABORATORY, INC.,

        Defendant/Counterplaintiff-Appellant.

UNPUBLISHED
October 20, 2025
9:56 AM

No. 369952
Ingham Circuit Court
LC No. 21-000382-CB

Before: GARRETT, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

In this breach-of-contract action, defendant/counterplaintiff-appellant, Scantibodies Laboratory, Inc., appeals as of right the circuit court's consent judgment granting a final money judgment of $500,000 in favor of plaintiff/counterdefendant-appellee, Bekum America Corp, and against Scantibodies. But, Scantibodies is actually challenging the earlier trial court orders granting: (1) summary disposition in Bekum's favor with respect to Scantibodies' counter-complaint, and (2) partial summary disposition in Bekum's favor with respect to Count 1 of Bekum's complaint.

On appeal, Scantibodies argues that the trial court erred by finding that Bekum: (1) did not breach the H-121S contract, (2) did not breach its express warranty, (3) did not breach the 707D contracts, (4) was not liable for fraudulent or innocent misrepresentation, and (5) was entitled to its actual attorney fees and costs. We conclude that the trial court erred by ruling as a matter of law that Bekum did not breach the H-121S contract, or its express warranty because a factual dispute remains. But we affirm the trial court's findings that: Scantibodies anticipatorily breached the 707D contracts, Scantibodies could not establish its misrepresentation claims, and Bekum was entitled to recover its actual attorney fees. Accordingly, we: (1) vacate, in part, the trial court's order granting Bekum's motion for summary disposition of Scantibodies' counter complaint; (2) affirm the trial court's order granting Bekum's partial motion for summary disposition; (3) vacate the trial court's consent judgment; and (4) remand for further proceedings regarding Scantibodies' H-121S breach-of-contract claim, Scantibodies' H-121S breach-of-warranty claim, and reevaluation of damages.

I. FACTS

This case arises out of four separate contracts memorializing Scantibodies' purchase of one "H-121S machine" and three "707D machines" from Bekum.

A. SCANTIBODIES BUSINESS WITH QUIDEL

Before this case came about, Scantibodies prepared medical test kits for Quidel Corporation, but it did not create the pipettes packaged within the kits. In February 2020, Scantibodies reached out to Quidel, offering to invest in machinery that would allow it to become Quidel's "2nd supplier" for its pipette needs. Scantibodies then sent sample pipettes to Xpress Industrial, requesting that Xpress reverse engineer the pipettes and create a technical drawing displaying the pipette dimensions. This drawing, referred to as the "SLI drawing," is as follows:



Notably, it is unclear why Scantibodies needed to have Xpress create the SLI drawing because Scantibodies was already in possession of Quidel's technical drawing for the pipettes. Quidel's drawing is as follows:



Importantly, the Quidel drawing included the following volume requirement: "DISPENSE VOLUME: 120μl ± 10%, USING DEIONIZED WATER," but the SLI drawing did not.

## B. PURCHASE NEGOTIATIONS

In July 2020, Jorge Guerra, Scantibodies' Purchasing Manager, e-mailed Luis Rodriguez, a Bekum representative, inquiring about potentially purchasing blow molding machines in order to produce pipettes for Quidel, and the SLI drawing was attached to this e-mail. Guerra testified that when responding to the initial inquiry, Rodriguez told him that Bekum was "familiar with the production of pipettes and that the machines are capable of doing it, stating that [Bekum] actually made extrusion molding machines for pipettes." But Guerra explained that Rodriguez failed to mention that Bekum's experience with pipette-molding machines was related to a single machine created in the 1990s.

## C. THE PURCHASE

After further negotiations, Scantibodies agreed to purchase one H-121S machine and three 707D machines. The H-121S machine—a smaller machine that was previously used at Ferris State University—was purchased after Scantibodies inquired about any used or refurbished equipment that would expedite pipette production. In October 2020, Bekum sent Scantibodies an order confirmation for the H-121S machine, which included an interrelated pipette trimming station, totaling $406,151. Bekum also sent Scantibodies three separate order confirmations for the three separate 707D machines, together totaling $4,237,822.50. Scantibodies signed all four order

confirmations and paid Bekum a down payment for each machine. Bekum agreed to deliver the H-121S machine by mid-December 2020, the first 707D machine by the end of August 2021, the second 707D machine by mid-October 2021, and the third 707D machine by mid-December 2021.

Notably, each order confirmation included an article tolerance table, but only the H-121S order confirmation referenced the SLI drawing. Each order confirmation also included identical terms and conditions of sale

## D. PREPARATION OF THE H-121S MACHINE

In the beginning of November 2020, Bekum obtained the H-121S machine and began inspecting it for Scantibodies. Bekum worked with Compact Mould to create an eight-cavity mold for the machine—this mold was produced in accordance with the SLI drawing. Once the mold arrived, Bekum fine-tuned the machine settings and process. Joseph Slenk, a Bekum engineer, took responsibility for developing this process.

## E. SCANTIBODIES' FIRST ATTEMPT TO CANCEL THE CONTRACTS

In late November 2020, Scantibodies learned that Quidel was planning to purchase pipettes from another party. As a result, Scantibodies informed Bekum that it wanted to cancel its orders for the 707D machines and requested that Bekum supply any proposed cancellation costs. Bekum provided Scantibodies with three options, one of which included a potential 25% cancellation fee, but by mid-December 2020, Scantibodies informed Bekum that it intended to proceed with the orders as originally planned.

## F. DELIVERY OF THE H-121S MACHINE

Before the scheduled virtual factory acceptance test (VFAT),[1] Scantibodies e-mailed Bekum a list of "critical dimensions" for the pipettes. Notably, the pictured diagram attached to this e-mail was identical to the Quidel drawing, but it did not list any of the writing from the Quidel drawing, including the volume requirement. After fine-tuning the H-121S machine, and before the VFAT, Slenk sent Scantibodies sample pipettes created on the machine for inspection.

On December 14, 2020, Bekum timely tendered the H-121S machine for the parties' scheduled VFAT, which occurred at Bekum's facility. At the VFAT, Bekum's technical team demonstrated the machine's operation and pipette processing to Scantibodies' representatives via video conference. During the VFAT, a Scantibodies representative told Slenk that the pipettes had an inconsistent internal diameter and dispensed inconsistent volumes of water; Slenk told the representative that he could solve the variations in dimensions by changing the machine settings. On December 15, 2020, Scantibodies signed the machine acceptance form, which indicated that the H-121S machine passed the VFAT. Slenk testified that after the VFAT, he made a "very common change" in the machine, which allowed the pipettes to "achieve the dimension

---

[1] A VFAT is intended "to show the customer that the machine performs as expected." It also allows the customer to see the machine run "with no errors, no stoppages" and compare the manufactured items with "the drawings."

[requirements] on the drawing." In January 2021, Scantibodies received the H-121S machine, and Scantibodies paid the remaining balance for the H-121S contract.

## G. SCANTIBODIES' CONCERNS WITH THE H-121S MACHINE AFTER DELIVERY

Scantibodies has admitted that after the H-121S machine was delivered, "it was able to produce some satisfactory pipettes"; however, Scantibodies has maintained that "the machine could not consistently produce acceptable Pipettes under production conditions." David Sandoval, a Scantibodies' employee, explained that the pipettes produced by the machine: (1) did not have a "straight" internal pipe, and (2) dispensed varying amounts of liquid.

In early February 2021, Scantibodies informed Bekum that it "was not achieving the required volume with the pipette."[2] Slenk testified that this was the first time that Bekum heard about the volume requirement, and had that requirement been disclosed earlier, Slenk would have "advised against the project." Guerra acknowledged that the volume requirement was not disclosed to Bekum until after the contracts were signed; however, Guerra explained that "volume is related to the physical properties of the product," and if the physical dimensions were achieved, then so too would the volume requirement. Jorge Escasan, Scantibodies director of operations, also testified that when the pipettes were within the SLI drawing dimensions, "the proper volume was dispensed." But Slenk testified that a pipette could pass the SLI drawing's dimensional requirements but fail to dispense the volume requirement, and Timothy Womer, an expert retained by Scantibodies, agreed with Slenk, further noting that the total volume of the pipette's lower bulb was significantly more than the volume requirement.

Nevertheless, Bekum tried to work with Scantibodies to satisfy the newly disclosed volume requirement. Eventually, Bekum came to the conclusion that the current molds could not make the pipettes that Scantibodies wanted; therefore, on April 16, 2021, Bekum provided Scantibodies with a quote for additional costs and delivery delays. Nevertheless, on May 6, 2021, Scantibodies cancelled its purchase of the machines and demanded the return of funds already paid.

## H. TRIAL COURT PROCEEDINGS

In June 2021, Bekum filed a complaint against Scantibodies, alleging, *inter alia*, that Scantibodies breached the 707D contracts and that Bekum was entitled to declaratory relief. Scantibodies responded, arguing that Bekum breached the contracts first by failing to timely deliver a H-121S machine that was capable of consistently producing acceptable pipettes. Thereafter, Scantibodies formally filed a counter complaint, alleging that Bekum: (1) breached the H-121S contract, (2) breached the H-121S warranty, (3) breached the 707D contracts, and (4) was liable for fraudulent or innocent misrepresentation.

---

[2] The "required volume" referred to the same volume requirement listed on Quidel's drawing: "120μl ± 10%."

In April 2023, Bekum moved for summary disposition of Scantibodies counter complaint, pursuant to MCR 2.116(C)(10).[3] After a hearing, the trial court granted Bekum's motion for summary disposition. The trial court found that Bekum did not breach the contracts because (1) the SLI drawing was not a part of the parties' contracts, and (2) even if it were, Scantibodies failed to demonstrate a genuine issue of material fact because the drawing did not contain the volume requirement. The trial court's decisions regarding the other counts in Scantibodies' counter complaint largely rested with its finding that Bekum did not breach the H-121S contract. For example, the trial court found that because Scantibodies could not show that the H-121S machine failed to comply with the contract, Scantibodies could not show any breach of warranty. The trial court also found that because Bekum did not breach the H-121S contract, it did not repudiate the 707D contracts; the trial court chose to go even further by stating that "Scantibodies breached the 707-D machine contract with its attempt to cancel, which is an anticipatory repudiation." The trial court further stated that it could not assess Scantibodies' fraud claim because it lacked specificity, and it was indisputable that Bekum was an expert in blow-molding machines.

Thereafter, in August 2023, Bekum moved for summary disposition regarding Count I of its complaint—arguing that Scantibodies breached the 707D contracts—pursuant to MCR 2.116(C)(10). At the hearing on the motion, the trial court acknowledged that it "probably jumped the gun a little bit talking about anticipatory repudiation"; therefore, it "very carefully reviewed Scantibodies' response to this motion in order to fully address their arguments that they made regarding anticipatory repudiation." Nonetheless, the trial court ultimately: (1) granted Bekum's motion for partial summary disposition, and (2) awarded Bekum its actual attorney fees and costs.

In November 2023, Scantibodies moved the trial court to reconsider awarding Bekum its actual attorney fees and costs, opposed to its reasonable attorney fees and costs, which the trial court denied. In February 2024, the trial court issued a consent order that: (1) granted a final money judgment of $500,000 in favor of Bekum and against Scantibodies, and (2) dismissed the remaining count's in Bekum's complaint. Notably, Bekum was not obligated to return the funds already paid to Scantibodies.

Scantibodies now appeals.

II. PRESERVATION AND STANDARD OF REVIEW

"An issue is preserved for appeal if it was raised, addressed, and decided by the trial court." *George v Allstate Ins Co*, 329 Mich App 448, 453; 942 NW2d 628 (2019). In this case, each issue was raised, addressed, and decided by the trial court through Bekum's motions for summary disposition; therefore, each issue is preserved for appellate review. See *id.*

"We review de novo a trial court's decision on a motion for summary disposition, reviewing the record in the same manner as must the trial court to determine whether the movant was entitled to judgment as a matter of law." *Bronson Methodist Hosp v Auto-Owners Ins Co*, 295

---

[3] MCR 2.116(C)(10) reads: "Except as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law."

Mich App 431, 440; 814 NW2d 670 (2012). Our review is limited to the evidence that had been presented to the trial court at the time the motion was decided. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475-476; 776 NW2d 398 (2009). "To the extent this matter presents questions concerning the proper interpretation of contractual or statutory language, our review is also de novo." *Dobbelaere v Auto-Owners Ins Co*, 275 Mich App 527, 529; 740 NW2d 503 (2007).

MCR 2.116(C)(10) provides that the trial court may grant summary disposition in favor of the moving party when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Id*. at 270-271 (quotation marks and citation omitted). "A trial court may not assess credibility, weigh the evidence, or resolve factual disputes, and when material evidence conflicts, it is not appropriate for the court to grant the motion for summary disposition." *Cetera v Mileto*, 342 Mich App 441, 448; 995 NW2d 838 (2022).

"We review a trial court's grant or denial of attorney fees for an abuse of discretion. Any findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error, but questions of law are reviewed de novo." *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005) (citations omitted).

### III. H-121S BREACH-OF-CONTRACT CLAIM

Scantibodies first argues that the trial court erred by ruling as a matter of law that Bekum did not breach the H-121S contract. We agree.

In this case, in order for Bekum to succeed on its motion for summary disposition of Scantibodies' breach-of-contract claim, Bekum had to establish that there was no material dispute as to the following elements: (1) there was a contract (2) which was breached (3) thereby resulting in damages to Scantibodies. See *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 164; 934 NW2d 665 (2019). The parties agree that the only element at issue is whether Bekum breached the H-121S contract. The parties also agree that because the transactions in this matter involved the sale of goods, the Uniform Commercial Code (UCC), MCL 440.2101 *et seq*., governs the contracts in this case.

To determine whether Bekum satisfied its obligations under the H-121S contract, we must first determine what Bekum's contractual obligations were. The crux of this issue hinges on whether the SLI drawing was incorporated into the H-121S contract, and if so, whether a factual dispute exists regarding whether the H-121S machine consistently met the requirements of the SLI drawing.

### A. CONTRACTUAL AND STATUTORY INTERPRETATION

"The primary goal in interpreting contracts is to determine and enforce the parties' intent. To do so, this Court reads the agreement as a whole and attempts to apply the plain language of the contract itself." *Village of Edmore v Crystal Automation Sys Inc*, 322 Mich App 244, 262; 911 NW2d 241 (2017) (quotation marks and citations omitted). "The language of a contract is to be given its ordinary, plain meaning; technical, constrained constructions should be avoided." *Id*. "The construction of the terms of a contract is generally a question of law for the court; however, where a contract's meaning is ambiguous, the question of interpretation should be submitted to the fact-finder." *Id*. "A contract is ambiguous when its words can reasonably be understood in different ways. Inartfully worded or clumsily arranged contract terms do not render a contract ambiguous if it fairly admits of one interpretation." *Id*. (citation omitted).

"Contracts must be construed as a whole, giving effect to all provisions. Courts must avoid interpretations that would render any part of a contract surplusage or nugatory and must also, if possible, seek an interpretation that harmonizes potentially conflicting terms." *Id*. at 263 (citation omitted). "Further, where a contract contains specific and general terms, the specific terms normally control over the general terms." *Id*. "Parties are free to contract as they see fit, and courts must enforce contracts as written unless they are in violation of law or public policy." *Id*. "[A] court may not substitute its judgment for the intent of the parties and remake the contract into something the parties never intended." *Id*. (citation omitted).

"A court's primary purpose in interpreting a statute is to ascertain and effectuate legislative intent. Courts may not speculate regarding legislative intent beyond the words expressed in a statute." *Mich Ed Ass'n v Secretary of State*, 489 Mich 194, 217-218; 801 NW2d 35 (2011) (quotation marks and citations omitted). "As far as possible, effect should be given to every phrase, clause, and word in the statute." *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999). "When the plain and ordinary meaning of statutory language is clear, judicial construction is neither necessary nor permitted." *Pace v Edel-Harrelson*, 499 Mich 1, 7; 878 NW2d 784 (2016).

## B. THE SLI DRAWING'S INCLUSION

Scantibodies argues that the trial court erred by finding that the SLI drawing was not a part of the parties' H-121S contract. We agree.

By Bekum's own admission, the SLI drawing was used to develop the machine. Therefore, the question is not whether the SLI drawing was relevant, but whether Bekum was contractually obligated to follow the SLI drawing's dimensional requirements. When asserting that the SLI drawing was not a part of the H-121S contract, Bekum makes the following arguments: (1) the contract did not mention the SLI drawing in relation to the actual H-121S machine, and (2) paragraphs 2 and 19 of the contract's terms and conditions expressly disclaimed the incorporation of any drawings.

Relying on the doctrine of *expressio unius est exclusio alterius*,[4] Bekum first argues that because the contract expressly mentioned the SLI drawing in one section of the contract, which related to the stand-alone trimming station, the SLI drawing was excluded from the other sections of the contract, which related to the actual H-121S machine. We disagree.

Item G of the H-121S order confirmation referenced the SLI drawing—in accordance with the interrelated stand-alone trimming station—as follows:

**ITEM G: STANDALONE PIPETTE TRIMMING STATION:**

**Pipettes Deflash Press and Tooling**
**Per Drawing number 120DBPP-LS**
**Deflash press and tooling to trim 8 parts from 1 shot of blow molder.**

The entire purpose of the H-121S contract was to produce pipettes. The H-121S machine *required* a stand-alone trimming station to produce the pipettes—the machines could not fulfil the contractual agreement separate from each other. Moreover, it appears that the trimming station machine was used *after* the H-121S machine roughly produced the pipettes. Accordingly, the pipettes had to go through the trimming station—which was without a doubt subject to the SLI drawing's dimensions—before being finalized. It is therefore nonsensical to believe that the final product would not be subject to the SLI drawing's dimensions. Therefore, when the contract is read as a whole, giving effect to all provisions, it appears that if the trimming station needed to conform with the SLI drawing, then so too would the H-121S machine. See *Village of Edmore*, 322 Mich App at 262-263.

Bekum further argues that paragraphs 2 and 19 of the terms and conditions expressly disclaimed the incorporation of any drawings. We disagree.

Paragraph 2 of the contract's terms and conditions stated, in pertinent part, that "unless expressly incorporated within such Specifications, no drawing, sample, specification, weight, rating, production figure or other affirmation of fact or promise concerning the Equipment shall be deemed a part of the Contract." As previously discussed, the SLI drawing was expressly referenced in the H-121S contract; therefore, paragraph 2 does not exclude the SLI drawing. Similarly, paragraph 19's integration clause is inapplicable because the SLI drawing was incorporated into the H-121S contract; therefore, it would not need to be introduced as a prior correspondence.

Accordingly, we conclude that the SLI drawing was a part of the parties' H-121S contract.

### C. THE SLI DRAWING'S REQUIREMENTS

---

[4] The doctrine of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) "has been described as a rule of construction that is a product of logic and common sense." *Detroit City Council v Detroit Mayor*, 283 Mich App 442, 456; 770 NW2d 117 (2009) (quotation marks and citation omitted). "The doctrine characterizes the general practice that when people say one thing they do not mean something else." *Id*. (quotation marks and citation omitted).

We conclude that a factual dispute exists as to whether the H-121S machine consistently met the requirements of the SLI drawing.

Notably, despite the lengthy discovery conducted in this case, there was very little record evidence directly noting whether the SLI drawing's dimensional requirements were met by the H-121S machine because most of the complaints only related to the amount of volume the pipettes dispensed. Nevertheless, Slenk testified that after the VFAT, he made a "very common change" in the machine, which allowed the pipettes to "achieve the dimension [requirements] on the drawing." Conversely, Sandoval testified that the pipettes did not have a "straight" internal pipe. This conflict in evidence alone appears to present a factual dispute about whether the SLI drawing's dimensional requirements were met by the H-121S machine.

Additionally, there is ample evidence regarding whether the pipettes produced by the H-121S machine were able to dispense the desired volume. Scantibodies argues that although the volume requirement was not outlined in the contract, it was a method used to determine whether the SLI drawing's dimensional requirements were being met. If Scantibodies is correct in this assertion, then there is more competing evidence showing whether the H-121S machine consistently met the requirements of the SLI drawing.

The deposition testimony in this case contains two competing theories regarding whether following the SLI drawing's dimensions would have produced pipettes that dispensed the desired volume. Guerra and Escasan, two Scantibodies employees, both testified that when the pipettes were within the SLI drawing dimensions, the proper volume was dispensed. But Slenk, a Bekum employee, testified that a pipette could pass the SLI drawing dimensional requirements but fail to dispense the volume requirement, and Womer, an expert retained by Scantibodies, agreed with Slenk, further noting that the total volume of the pipette's lower bulb was significantly more than the volume requirement. Again, this conflict in evidence presents a factual dispute that if resolved, could provide more information as to whether the SLI drawing's dimensional requirements were met by the H-121S machine.

Accordingly, the trial court erred by ruling as a matter of law that Beckum did not breach the H-121S contract because the SLI drawing was a part of the parties' H-121S contract, and a factual dispute exists as to whether the H-121S machine consistently met the requirements of the SLI drawing.

## IV. H-121S BREACH-OF-WARRANTY CLAIM

Scantibodies further argues that the trial court erred by ruling as a matter of law that Bekum did not breach the H-121S contract's express warranty. We agree.

In this case, the trial court's decisions largely rested with its finding that Bekum did not breach the H-121S contract. For example, the trial court found that because Scantibodies could not show that the H-121S machine failed to comply with the contract, Scantibodies could not show any breach of warranty. But because we have concluded that a factual dispute exists regarding whether the H-121S machine complied with the contract, this issue needs to be reanalyzed on remand.

-10-

Notably, Bekum argues that the H-121S contract expressly limited Scantibodies' remedy to repair or replacement, not monetary damages. Although the trial court did not reach this issue, we will address it for the sake of clarity on remand.

"An express warranty may be created only between a seller and a buyer, and any such express warranty becomes a term of the contract itself." *Heritage Resources, Inc v Caterpillar Fin Servs Corp*, 284 Mich App 617, 634:774 NW2d 332 (2009). In this case, Scantibodies bears "the burden of establishing that [Bekum] breached the written limited warranty, i.e., that during the period of the warranty [Bekum was] notified of a defect that they failed to repair." See *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 117; 839 NW2d 223 (2013).

The UCC allows parties to limit their remedies for contractual breaches, see MCL 440.2719(1)(a); however, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act," MCL 440.2719(2). "Where a manufacturer or dealer has limited its obligation under the sales agreement to repair or replace defective parts[,] the seller does not have an unlimited time to make the repairs, but rather must repair or replace the parts within a reasonable time." *Kelynack v Yamaha Motor Corp, USA*, 152 Mich App 105, 112; 394 NW2d 17 (1986). "Commendable efforts alone do not relieve a seller of his obligation to repair." *Id*. (quotation marks and citation omitted). "[T]he manufacturer's or dealer's failure to make repairs need not be willfully dilatory or even negligent for the damage to the buyer is the same whether the seller acts in good faith or in bad" because "[i]n either case, the buyer loses the substantial benefit of his bargain." *Id*. Further, what constitutes a reasonable time "depends on the nature and circumstances of the case." *Id*. at 113.

"A warranty fails of its essential purpose where unanticipated circumstances preclude the seller from providing the buyer with the remedy to which the parties agreed, in which event the buyer is entitled to seek remedies under the standard UCC warranty provisions." *Computer Network, Inc v AM General Corp*, 265 Mich App 309, 314-315; 696 NW2d 49 (2005) (quotation marks, citation, and alteration omitted).

In this case, the H-121S order confirmation contained the following warranty provision, in pertinent part:

> 9. WARRANTY: Seller makes the following warranties to the original purchaser of the Equipment. The Equipment sold hereunder will conform to the agreed specifications. Seller makes no warranty with respect to Equipment manufactured in accordance with drawings, specifications, samples, or information furnished by Buyer. All parts manufactured by Seller which are defective in material or workmanship as defined to the Buyer will be repaired or replaced if the defect appears and is reported to Seller within six (6) months from the date of delivery. . . . *Seller's liability under the warranty is limited to replacing or repairing*, at Seller's option, parts determined to be non-conforming or defective, at no cost to Buyer, and Seller shall have no further liability for non-conformities or defects, whether based on Contract, negligence, strict liability in tort or otherwise. (Emphasis added.)

Therefore, the parties clearly limited Scantibodies' remedy to repair or replacement. There is no dispute that Bekum clearly made attempts to repair the H-121S machine. But, "[c]ommendable efforts alone do not relieve a seller of his obligation to repair." *Kelynack*, 152 Mich App at 112 (quotation marks and citation omitted).

For the reasons previously explained, a factual dispute exists as to whether the H-121S machine consistently met the requirements of the SLI drawing. Once this factual dispute is resolved on remand, this issue may be analyzed, i.e., whether Bekum needed to repair the machine, and if so, whether the H-121S machine was repaired within a reasonable time under the circumstances. *Id*.

## V. 707D BREACH-OF-CONTRACT CLAIM

Scantibodies further argues that the trial court erred by ruling as a matter of law that Scantibodies, not Bekum, breached the 707D contracts. We disagree.

"Under the doctrine of anticipatory repudiation: if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option to either sue immediately for the breach of contract or wait until the time of performance." *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 555; 904 NW2d 192 (2017) (quotation marks and citation omitted). "In determining whether an anticipatory breach has occurred, it is the party's intention manifested by acts and words that is controlling, and not any secret intention that may be held." *Id*. (quotation marks and citation omitted).

In this case, Scantibodies argued that Bekum anticipatorily breached the 707D contracts by informing Scantibodies that it could not fulfill the contractual obligations without more time and money. Conversely, Bekum argued that Scantibodies anticipatorily breached the 707D contracts by unequivocally cancelling the contracts. The trial court ultimately agreed with Bekum's argument by granting Bekum's motion for partial summary disposition. We affirm the trial court's ruling in this regard.

Unlike the H-121S contract, the 707D contracts did not include any reference to the SLI drawing. Each machine had its own order confirmation, the orders did not reference each other, and only two of the 707D contracts were even dated the same day. Without the inclusion of the SLI drawing, there were no contractual dimensional requirements for Bekum to be upheld by, much less any implied volume requirements.

The question then turns on whether the SLI drawing could be considered under any statutory exceptions. We conclude that it cannot.

Notably, MCL 440.2202(a) and (b) allow a contract to be explained or supplemented by: (1) "course of performance, course of dealing, or usage of trade"; or (2) "evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." But, because the 707D contracts contained paragraphs 2 and 19 in their terms and conditions, the contracts expressly stated that: (1) they were fully incorporated, and (2) any drawings not expressly incorporated into the agreement were not a

part of the contract. Therefore, the 707D contracts cannot be supplemented by the SLI drawing's dimensional requirements under MCL 440.2202(a) and (b).

Additionally, MCL 440.2209(2) renders the parties' contracts unmodifiable except by a signed writing between the parties. After the order confirmations were signed in this case, there were no further signed, written agreements that included the SLI drawing's dimensional requirements. Therefore, the SLI drawing cannot be considered under MCL 440.2209(2).

Therefore, Bekum was not held to any dimension or volume requirements under the 707D contracts. Accordingly, Bekum did not breach the 707D contracts by providing Scantibodies with a quote for additional costs and delivery delays to appease its customer and conform to the noncontractual terms that Scantibodies later required. Instead, the trial court properly found that Scantibodies anticipatorily breached the 707D contracts by unequivocally cancelling its purchase of the machines and demanding the return of funds already paid. See *Van Buren Charter Twp*, 319 Mich App at 555. Accordingly, we affirm the trial court's ruling in this regard.

## VI. FRAUDULENT-INDUCEMENT OR INNOCENT-MISREPRESENTATION CLAIM

Scantibodies further argues that the trial court erred by ruling as a matter of law that Scantibodies could not establish its misrepresentation claims. We disagree.

To establish fraud, a plaintiff must prove the following with a reasonable degree of certainty:

(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. [*Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012) (quotation marks and citation omitted).]

But claims for fraudulent inducement seek redress for "misrepresentations that induce the buyer to enter into a contract but that do not in themselves constitute contract or warranty terms subsequently breached by the seller." *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 375; 532 NW2d 541 (1995). "This Court has frequently reiterated that, to sustain a fraud claim, the party claiming fraud must *reasonably* rely on the material misrepresentation." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 39; 761 NW2d 151 (2008).

In contrast, to prove innocent misrepresentation, the plaintiff must prove that: "(1) the defendant made a material representation, (2) the representation was false, (3) the defendant made it with the intention of inducing reliance by the plaintiff, (4) the plaintiff acted in reliance on the representation, and (5) the plaintiff thereby suffered an injury that benefited the defendant." *Id*. "Reasonable reliance also must exist to support claims of innocent misrepresentation." *Id*. Therefore, the innocent misrepresentation rule eliminates the scienter requirement of fraud, but it adds "the requirements that the misrepresentation be made in connection with making a contract

and the injury suffered by the victim must inure to the benefit of the misrepresenter." *Titan Ins Co*, 491 Mich at 556 n 5 (quotation marks, citation, and alterations omitted).

"Because fraud must be pleaded with particularity, and is not to be lightly presumed, but must be clearly proved, by clear, satisfactory and convincing evidence, trial courts should ensure that these standards are clearly satisfied with regard to all of the elements of a fraud claim." *Cooper v Auto Club Ins Ass'n*, 481 Mich 399, 414; 751 NW2d 443 (2008) (quotation marks and citations omitted). A party's reliance on prior statements that are contradicted by the express terms of a contract is unreasonable. *Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 689; 599 NW2d 546 (1999).

On appeal, Scantibodies' fraud claims rest on the assertion that Bekum's purported experience with pipettes was misleading at best and false at worst. But, Guerra—the Scantibodies employee who engaged in all precontract negotiations with Bekum—testified that he did not believe that Bekum directly or indirectly made any fraudulent statements or representations that induced Scantibodies to enter the contracts in this case. Notably, contract negotiations were initiated by Scantibodies when Guerra e-mailed Rodriguez, inquiring about potentially purchasing blow molding machines. Therefore, Bekum did not contact Scantibodies first, alleging an extensive background in blow molding pipettes; instead, Bekum responded to Scantibodies' inquiry, stating that it had experience with similar machines, which it did.

Admittedly, Bekum's experience was in the 1990s; conducted by Bekum Germany, not Bekum America; and the pipettes created by that machine were "less complicated" than the pipettes requested in this case, but as the trial court stated, it was indisputable that Bekum was an expert in blow-molding machines. "An action for fraud may not be predicated upon the expression of an opinion or salesmen's talk in promoting a sale, referred to as puffing." *Van Tassel v McDonald Corp*, 159 Mich App 745, 750; 407 NW2d 6 (1987); see also *Hayes Constr Co v Silverthorn*, 343 Mich 421, 426; 72 NW2d 190 (1955). It appears that Scantibodies' inquiry for business was standard, and there is no record evidence suggesting that Bekum only made a certain type of blow-molding machine.

With the benefit of hindsight, Guerra also testified that had Rodriguez clarified Bekum's experience with pipette-molding machines, it "most likely" would have influenced his decision to make a purchase from Bekum. This statement lacks reliability given that Guerra also repeatedly testified that he did not believe that Bekum directly or indirectly made any fraudulent statements or representations that induced Scantibodies to enter the contracts in this case.

The trial court properly determined that Scantibodies could not establish its misrepresentation claims. Scantibodies failed to plead these claims—specifically that Bekum made a false representation—with particularity, much less prove them by clear, satisfactory, convincing evidence. See *Cooper*, 481 Mich at 414. Accordingly, we affirm the trial court's ruling in this regard.

## VII. ACTUAL ATTORNEY FEES

Scantibodies further argues that the trial court erred by ruling as a matter of law that Bekum was entitled to its actual attorney fees and costs. We disagree.

Michigan follows the "American Rule" for attorney fees, under which "attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract." *Reed*, 265 Mich App at 164. "The parties to a contract may include a provision that the breaching party will be required to pay the other side's attorney fees and such provisions are judicially enforceable." *Zeeland Farm Servs, Inc v JBL Enterprises, Inc*, 219 Mich App 190, 195; 555 NW2d 733 (1996). Generally, "when a contract specifies that a breaching party is required to pay the other side's attorney fees, only reasonable, not actual, attorney fees should be awarded." *Papo v Aglo Restaurants of San Jose, Inc*, 149 Mich App 285, 299; 386 NW2d 177 (1986) (citation omitted); see *Zeeland Farm Servs, Inc*, 219 Mich App at 195-196.

There is no published caselaw indicating whether actual attorney fees, opposed to reasonable attorney fees, may be awarded to a party if the contractual language unambiguously calls for it. But, there is unpublished caselaw that states when "the contract language plainly and unambiguously provides for the recovery of 'actual attorneys [sic] fees,' we must simply enforce the contract language as written." *Cargas v Bednarsh*, unpublished per curiam opinion of the Court of Appeals, issued January 9, 2007 (Docket Nos. 263869, 263870), pp 1-2 (quotation marks and citation omitted).[5] Similarly, in *Ward v Filarski*, unpublished per curiam opinion of the Court of Appeals, issued September 17, 2019 (Docket No. 340707), p 9, a panel of this Court upheld the trial court's award of actual attorney fees "because the purchase agreement explicitly provided for the award of 'all actual attorney fees and costs incurred by the Sellers' "; therefore, the trial "court was not required to make findings regarding reasonableness, and did not abuse its discretion in making this award."

"The primary goal in interpreting contracts is to determine and enforce the parties' intent. To do so, this Court reads the agreement as a whole and attempts to apply the plain language of the contract itself." *Village of Edmore*, 322 Mich App at 262 (quotation marks and citations omitted). "The language of a contract is to be given its ordinary, plain meaning; technical, constrained constructions should be avoided." *Id*. In this case, the contracts' plain language unambiguously provided for the recovery "actual attorneys' fees and expenses."[6] Therefore, the trial court did not err by enforcing the contracts' language as written. See *Village of Edmore*, 322 Mich App at 262; *Ward*, unpub op at 9; *Cargas*, unpub op at 2.

VIII. CONCLUSION

---

[5] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

[6] Paragraph 14 of the contracts' terms and conditions provided, in pertinent part, as follows:

14. ADDITIONAL COSTS: . . . Buyer shall pay or reimburse Seller for any and all costs and expenses incurred by Seller in the collection of any amount due under these Terms, including without limitation, the costs of any court proceedings and *actual attorneys' fees and expenses*. (Emphasis added.)

The circuit court's consent judgment is vacated, and the circuit court's order granting Bekum's motion for summary disposition of Scantibodies' counter complaint is vacated in part.

This matter is remanded to the trial court for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Kristina Robinson Garrett
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney